# In the
# United States Court of Appeals
# for the Eighth Circuit

**23-1207**

Aaron Norgren,

*Plaintiff-Appellant,*

v.

Minnesota Department of Human Services, et al.,

*Defendants-Appellees.*

**23-1208**

Joseph Norgren,

*Plaintiff-Appellant,*

v.

Minnesota Department of Human Services, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota

## BRIEF OF PLAINTIFFS-APPELLANTS

Douglas P. Seaton
James V. F. Dickey
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN 55426
(612) 428-7002

*Attorneys for Plaintiffs-Appellants*

Appellate Case: 23-1207     Page: 1     Date Filed: 03/28/2023 Entry ID: 5259091

## SUMMARY OF THE CASE

Appellees Joseph and Aaron Norgren are father and son who each initiated a separate lawsuit after Appellee Jodi Harpstead, Commissioner of the Appellee Minnesota Department of Human Services ("DHS"), directed that all employees undergo critical-race-theory and gender-identity trainings. These trainings conflicted with the Norgrens' sincerely held religious beliefs and compelled them to speak contrary to their beliefs. These trainings explicitly intended to change employees' "minds for life," J.App.007, R. Doc. 1 (Aaron), Compl. ¶ 33, told the Norgrens "we need you all to do this" (referring to no longer saying "I am not a racist," and like phrases), J.App.003-004, R. Doc. 1 (Aaron), Compl. ¶ 16, and told the Norgrens to use pronouns consistent with another's claimed gender identity even if it conflicts with biological sex, despite the Norgrens' Christian beliefs, J.App.004, R. Doc. 1 (Aaron), Compl. ¶ 17. The Norgrens objected to these trainings but were denied religious exemptions. DHS discriminated and retaliated against them, so they brought this lawsuit.

Appellees DHS and Harpstead moved to dismiss both actions. The district court incorrectly granted both motions, and the Norgrens timely appealed. This Court should reverse and remand for further proceedings. Appellants believe the Court should hear oral argument in this case and request a total of 30 minutes of oral argument, 15 minutes per side.

# TABLE OF CONTENTS

SUMMARY OF THE CASE.................................................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES ............................................................iv

JURISDICTIONAL STATEMENT.......................................................1

STATEMENT OF LEGAL ISSUES ...................................................2

STATEMENT OF THE CASE...........................................................3

    I.    Introduction...........................................................................3

    II.   The Norgrens and Their Beliefs and Experiences. ......................3

    III.  The Mandated Trainings and the Norgrens' Opposition to Them. ............5

    IV.  DHS and Harpstead Force the Norgrens to Take the Trainings.................8

    V.   DHS Created a Hostile Work Environment for Christians and Those Who Support Title VII's View of Racial Equality....................................9

    VI.  Appellees' Hostile Environment and Their Refusal to Exempt Joseph from the Trainings Force Him to Prematurely Retire. ............................10

    VII. Appellees Refuse to Exempt Aaron from the Trainings, Continue Their Hostile Treatment of Aaron, and Deny Him Job Opportunities Because He Asserted His Beliefs and Legal Rights. ............................................12

    VIII.   Procedural History .................................................................14

SUMMARY OF THE ARGUMENT ...................................................15

ARGUMENT .................................................................................18

    I.    Standard of Review for All Claims .........................................18

    II.   Aaron Pleaded Sufficient Facts to Support His Claim for Title VII Retaliation Against DHS. ...........................................................19

    III.  The Norgrens Adequately Pleaded Claims for Title VII Religious Discrimination. ....................................................................24

        A.  Aaron adequately pleaded that DHS failed to promote him because of his religious beliefs and expression...................................26

        B.  Joseph adequately pleaded that he was constructively discharged

Appellate Case: 23-1207    Page: 3    Date Filed: 03/28/2023 Entry ID: 5259091

because of his religious beliefs. .......................................................29

    1.   DHS constructively discharged Joseph. ...........................29

    2.   Joseph adequately pleaded that he suffered intentional discrimination because of his religious beliefs. ...........................34

IV.  The Norgrens Have Pleaded Sufficient Facts to Support Their First Amendment Claims Against Commissioner Harpstead. ..........................38

  A.  Harpstead's policies and personal actions caused the Norgrens' constitutional injuries. ...........................................................39

  B.  Harpstead Compelled the Norgrens' Silence on Some Matters of Public Concern, and Their Speech on Others. ........................................44

  C.  Harpstead does not enjoy qualified immunity for her actions. ..............47

**CONCLUSION** ...........................................................................................**49**

**CERTIFICATE OF COMPLIANCE** ............................................................**51**

**CERTIFICATE OF SERVICE** .....................................................................**52**

iii

# TABLE OF AUTHORITIES

**STATUTES**

28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. § 1331 ...................................................................................................1

28 U.S.C. § 1343 (a)(3)........................................................................................1

42 U.S.C. § 1983 ...................................................................................................1

42 U.S.C. § 2000e-2(a)(1) ....................................................................................2

42 U.S.C. § 2000e-3(a) .........................................................................................2

Minn. Stat. § 246.0135........................................................................................41

Minn. Stat. § 256.01, subd. 2(a)(1) ............................................................. 41, 43

Mo. Rev. Stat. § 217.025 ....................................................................................43


**CASES**

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001) ............................... 46

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................ 2, 16, 18, 39

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ....................................................16, 18

*Blomker v. Jewell*, 831 F.3d 1051 (8th Cir. 2016) ........................................................ 25

*Bonner v. Outlaw*, 552 F.3d 673 (8th Cir. 2009)........................................................... 39

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007) ........................ 22

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)....................................................38, 48

*Brown v. Chi. Transit Auth.*, No. 17 cv 08473, 2020 U.S. Dist. LEXIS 27222 (N.D. Ill. Feb. 14, 2020) ..................................................................................................... 23

*Buonanno v. AT&T Broadband,* LLC, 313 F. Supp. 2d 1069 (D. Colo. 2004)........ 36

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (*per curiam*).................... 22

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) ................................................... 28

*Cooper v. Schriro*, 189 F.3d 781 (8th Cir. 1999) ........................................................ 43

Appellate Case: 23-1207      Page: 5      Date Filed: 03/28/2023 Entry ID: 5259091

*Cressman v. Thompson,* 798 F.3d 938 (10th Cir. 2015) .........................................38, 43

*Dammen v. UniMed Med. Ctr.*, 236 F.3d 978 (8th Cir. 2001)...................................21

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) ...........................................39

*E.E.O.C. v. Kohler Co.,* 335 F.3d 766 (8th Cir. 2003)...........................................28

*E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326 (7th Cir. 2002) ........................34, 35

*Fercello v. Cnty. of Ramsey,* 612 F.3d 1069 (8th Cir. 2010) ....................................30

*Fiero v. CSG Sys., Inc.*, 759 F.3d 874 (8th Cir. 2014) .......................................18, 24

*Fitzgerald v. Henderson,* 251 F.3d 345 (2d Cir. 2001).............................................29

*Gibson v. Am. Greetings Corp.,* 670 F.3d 844 (8th Cir. 2012)..............................2, 19

*Graham v. Bd. of Educ.*, 8 F.4th 625 (7th Cir. 2021) ...............................................26

*Green v. Potter*, No. 10-cv-02201-LTB-KMT, 2011 U.S. Dist. LEXIS 74981 (D. Colo. Jul. 12, 2011) .............................................................................................31

*Grubbs v. Arizona*, No. CV-20-02369-PHX-DJH, 2021 U.S. Dist. LEXIS 192150 (D. Ariz. Oct. 5, 2021) ...........................................................................................35

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) .................................................30

*Hukkanen v. Int'l Union,* 3 F.3d 281 (8th Cir. 1993) .................................................30

*Jackson v. Nixon*, 747 F.3d 537 (8th Cir. 2014)...............................................passim

*Janus v. AFSCME, Council 31,* 138 S. Ct. 2448 (2018)...................................2, 38, 48

*Jones v. Alpha Rae Pers., Inc.*, 903 F. Supp. 2d 680 (N.D. Ind. 2012)....................23

*Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774 (7th Cir. 2022)...................................26

*Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893 (8th Cir. 2002)..........22, 24

*Lang v. Ill. Dep't of Children & Family Servs.,* 361 F.3d 416 (7th Cir. 2004) .......23

*Lee v. K Mart Corp.,* 836 F. Supp. 841 (D. Minn. 2011) ...........................................28

*Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019)....................28

*Lindale v. Tokheim Corp.,* 145 F.3d 953 (7th Cir. 1998) ...........................................30

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015) .....................................19

*MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923 (8th Cir. 2004) ..............................29

v

*Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766 (7th Cir. 2008) .................. 22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ..................................... 2, 24

*Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072 (8th Cir. 2013) .................................. 28

*Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357 (7th Cir. 2009) .......................... 25

*Patton v. Forest River*, No. 3:18-CV-419 DRL-MGG, 2020 U.S. Dist. LEXIS 27029 (N.D. Ind. Feb. 18, 2020) ................................................................................ 23

*Perdue v. C. Hager & Sons Hinge Mfg., Co.*, 412 F. Supp. 2d 1227 (M.D. Ala. 2005) ................................................................................................................................ 35

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) .......................................................... 46

*Robinson v. Potter*, 453 F.3d 990 (8th Cir. 2006) ...................................................... 25

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .. 3, 48

*Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881 (8th Cir. 2015) ............................... 24

*Smith v. Allen Health Sys., Inc.*, 302 F.3d 827 (8th Cir. 2002) ................................ 22

*Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224 (10th Cir. 2009) ................. 30

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .............................................. 18, 25

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ......................... 38, 48

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ................................... 25

*United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158 (8th Cir. 2019) ................................................................................................................... 22

*Usenko v. MEMC, LLC*, 926 F.3d 468 (8th Cir. 2019) ............................................... 18

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................... 48

*Wharton v. Cnty. of Nassau*, No. 10-CV-0265(JS)(AKT), 2013 U.S. Dist. LEXIS 129127 (E.D.N.Y. Sep. 10, 2013) ................................................................................ 35

*Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368 (8th Cir. 2017) ...... 2, 19, 21, 22

*Wright v. Winnebago Industries, Inc.*, 551 F. Supp. 2d 836 (N.D. Iowa 2008) ...... 28

*Young v. Southwestern Savings and Loan Association*, 509 F.2d 140 (5th Cir. 1975) ....................................................................................................................... 2, 31, 32

*Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015) (en banc) ..................................... 18

Appellate Case: 23-1207     Page: 7     Date Filed: 03/28/2023 Entry ID: 5259091

**OTHER AUTHORITIES**

Br. of *Amici Curiae* Religious Freedom Institute's Islam & Religious Freedom
 Action Team and Islamic Scholars in Support of Employers, *Bostock v. Clayton
 County*, 140 S. Ct. 1731 (2020) ..............................................................37

Fed. R. Civ. P. 12(b)(6)..............................................................................17

Appellate Case: 23-1207     Page: 8     Date Filed: 03/28/2023 Entry ID: 5259091

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction over the Norgrens' claims pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3), which confer original jurisdiction on federal district courts to hear suits alleging violations of the U.S. Constitution and federal laws, including 42 U.S.C. § 1983 and Title VII. The district court entered judgment dismissing Counts I-VI of Joseph Norgren's claims and Counts I-VII of Aaron Norgren's claims on January 4, 2023. J.App.117; R. Doc. 39 (Joseph) and J.App.046; R. Doc. 23 (Aaron). Appellants filed timely appeals on February 3, 2023. J.App.119; R. Doc. 40 (Joseph) and J.App.048; R. Doc. 24 (Aaron). The Court has jurisdiction pursuant to 28 U.S.C. § 1291.

1

# STATEMENT OF LEGAL ISSUES

1.  Whether the district court erred by dismissing Joseph and Aaron Norgren's claims for religious discrimination under 42 U.S.C. § 2000e-2(a)(1) when it held that each failed to plead sufficient factual allegations to establish those claims.

Apposite Cases and Statutes:

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)
*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)
*Young v. Southwestern Savings and Loan Association*, 509 F.2d 140 (5th Cir. 1975)
42 U.S.C. § 2000e-2(a)(1).

2.  Whether the district court erred by dismissing Aaron Norgren's claim for retaliation under Title VII when it held that he failed to plead sufficient factual allegations to establish a *prima facie* case of retaliation.

Apposite Cases and Statutes:

*Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 372 (8th Cir. 2017)
*Gibson v. Am. Greetings Corp.,* 670 F.3d 844 (8th Cir. 2012)
*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)
42 U.S.C. § 2000e-3(a)

3.  Whether the district court erred by dismissing Joseph and Aaron Norgren's section 1983 compelled-speech claims by holding that each failed to plead sufficient factual allegations to establish a prima facie case that their First Amendment rights were violated.

Apposite Cases and Statutes:

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)

2

*Jackson v. Nixon*, 747 F.3d 537 (8th Cir. 2014)

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006)

## STATEMENT OF THE CASE

### I. Introduction.

Through new trainings and express speech directives, Commissioner Jodi Harpstead sought to change the minds of DHS employees to reflect the DHS' preferred view of the world, as it relates to "antiracism," "critical race theory," and gender identity. These trainings and their included directives made clear that dissent would not be tolerated but instead treated with contempt, ridiculed, and squeezed out. This is what the Norgrens experienced and have alleged in this case.[1]

### II. The Norgrens and Their Beliefs and Experiences.

Joseph Norgren is a devout Christian; his faith informs every aspect of his life. He is also fifty percent Native American.[2] Joseph worked as a security counselor with the Minnesota Security Hospital ("Security Hospital") for twenty-seven years.[3] During Joseph's tenure with the Security Hospital, he was an exemplary employee

---

[1] J.App.003-009; R. Doc. 1 at 3, 7, Compl. ¶¶ 13-48 (Aaron); J.App.079-084; R. Doc. 15 at 3-8, Am. Compl. ¶¶ 12-39 (Joseph). Throughout this brief, Appellants refer to Joseph Norgren as "Joseph" and Aaron Norgren as "Aaron," to avoid confusion. Appellants also refer to all Appellees as "DHS," collectively, unless otherwise noted. Also, because of the number of dual citations, to improve readability, fact citations will be in footnotes.

[2] J.App.078; R. Doc. 15 at 2, Am. Compl. ¶ 7 (Joseph).

[3] J.App.079; R. Doc. 15 at 3, Am. Compl. ¶ 10 (Joseph).

3

who had never received any formal complaints.[4] But for Joseph's constructive termination, he had anticipated continuing to work for another three years to receive a larger pension at the thirty-year mark.[5]

Aaron—Joseph's son—is also a Christian and is twenty-five percent Native American.[6] He is and has been a Forensic Support Specialist with the Forensic Mental Health Program ("FMHP") for approximately nine years; this program was formerly known as the Security Hospital and remains part of the DHS.[7]

The Norgrens belong to the tribe of the Ojibwe of the Red Lake Nation; their ancestors lived on the Red Lake Reservation in Minnesota.[8] As such, discrimination is unfortunately nothing new for the Norgrens and their family. Joseph recalls being subject to racial slurs and other discriminatory behavior because of his Native American heritage.[9] These experiences impacted the Norgrens' own beliefs regarding race being nondeterminative of failure or success in life.[10]

---

[4] J.App.084; R. Doc. 15 at 8, Am. Compl. ¶ 34 (Joseph).

[5] J.App.084; R. Doc. 15 at 8, Am. Compl. ¶ 35 (Joseph).

[6] J.App.002; R. Doc. 1 at 2, Compl. ¶ 7 (Aaron).

[7] J.App.002; R. Doc. 1 at 2, Compl. ¶ 9 (Aaron).

[8] *E.g.,* J.App.002; R. Doc. 1, Compl. ¶ 7 (Aaron).

[9] J.App.078; R. Doc. 15 at 2, Am. Compl. ¶ 8 (Joseph).

[10] *E.g.,* J.App.078, R. Doc. 15 at 2, Am. Compl. ¶ 8 (Joseph).

## III. The Mandated Trainings and the Norgrens' Opposition to Them.

DHS mandated certain "equity" trainings at issue and compelled the Norgrens to complete them. These trainings, including HR 670.1 ("CRT Training") and HR 670.2 ("Gender Identity Training"), were not mere information, but included express directives and requirement—from positions of superiority—as to how the Norgrens should think, speak, and act.[11] These trainings contradicted the Norgrens' religious beliefs and their views on equality, and the Norgrens' views on equality are consistent with the principles of equality under Title VII.[12]

In contrast, the CRT Training focused on the teachings of Ibram X. Kendi and included a full, mandatory minute of silence for the murder of George Floyd.[13] *Id.* The training instructed the Norgrens to stop using the phrases "I am not a racist" and "I can't be a racist" as a defense or denial.[14] The Norgrens were also told to admit the definition of racist as someone who supports racist policies or expresses racist ideas; to confess to the racist policies and ideas purportedly Americans support; and to accept that the United States of America is the root of such purportedly racist ideas.[15] DHS Assistant Commissioner Karen McKinney emphasized the importance

---

[11] *E.g.,* J.App.003-004, R. Doc. 1 at 3-4, Compl. ¶¶ 14-17 (Aaron).

[12] *E.g.,* J.App.003-006, R. Doc. 1 at 3-6, Compl. ¶¶ 14-23 (Aaron).

[13] *E.g.,* J.App.003, R. Doc. 1 at 3, Compl. ¶ 14 (Aaron).

[14] *E.g.,* J.App.003, R. Doc. 1 at 3, Compl. ¶ 15 (Aaron).

[15] *Id.*

of the embodiment and application of such principles by emphasizing, "we need all of you to do this."[16] Commissioner McKinney's directive led the Norgrens to believe that they were, in fact, obligated to admit the truth of the training's definition of racism, confess to "racist" policies and ideas they purportedly support, and accept the notion that the United States of America is the source of those purportedly racist ideas.[17]

Yet another one of the four trainings, HR 670.2, entitled "Understanding Gender Identity and Expression: Moving Beyond the Binary," sought to "educate" employees on gender identity. The Gender Identity Training expressly instructed employees to refrain from telling others that their gender identity is wrong.[18] This command is incompatible with the Norgrens' religious beliefs.[19]

The Norgrens opposed and objected to the CRT Training for several reasons.[20] Specifically, CRT and the training steeped in it reject core concepts of Western Liberalism, including meritocracy and colorblindness, and instead propose that invisible systems of power – "systemic racism" – bear the primary responsibility for

---

[16] *E.g.,* J.App.003-004, R. Doc. 1 at 3-4, Compl. ¶ 16 (Aaron).

[17] *E.g.,* J.App.004, R. Doc. 1 at 4, Compl. ¶ 16 (Aaron).

[18] *E.g.,* J.App.004, R. Doc. 1 at 4, Compl. ¶ 17 (Aaron).

[19] *E.g.,* J.App.006, R. Doc. 1 at 6, Compl. ¶¶ 22-23 (Aaron).

[20] *E.g.,* J.App.004-005, R. Doc. 1 at 4-5, Compl. ¶¶ 19-21 (Aaron).

6

racial inequality.[21] CRT and the training also deem any person in a minoritized racial group a victim of a rigged system and consider those born into "privileged races" as automatically and inherently exploiters of minorities.[22] *Id*. CRT and the training explicitly reject the principle of equality under the law, arguing that legal equality, nondiscrimination, and "colorblindness" are mere camouflages used to uphold white supremacist structures.[23] CRT and the training reject the traditional view of equality under Title VII and contend that the Norgrens' refusal to subscribe to CRT as two men of color is merely "internalized whiteness."[24]

The Norgrens also opposed and objected to the Gender Identity Training because it is inconsistent with the Norgrens' religious beliefs. The training insisted that the Norgrens use the pronouns chosen by another employee even if the employee's biological sex is inconsistent with those pronouns, and refrain from telling others that their gender identity is wrong. In contrast, the Norgrens believe that individuals are made in the image of God, and that God created only two sexes and two genders, male and female. Thus, the concepts of nonbinary gender and the belief that one can choose their gender or sex is contrary to their sincerely held religious beliefs, and

---

[21] *E.g.,* J.App.004, R. Doc. 1 at 4, Compl. ¶ 20.a (Aaron).

[22] *E.g.,* J.App.004, R. Doc. 1 at 4, Compl. ¶ 20.b (Aaron)

[23] *E.g.,* J.App.005, R. Doc. 1 at 5, Compl. ¶ 20.c (Aaron)

[24] *E.g.,* J.App.005, R. Doc. 1 at 5, Compl. ¶¶ 20.d, 20.e, 21 (Aaron).

7

the training requires action contrary to those beliefs.[25]

## IV.    DHS and Harpstead Force the Norgrens to Take the Trainings.

In August 2020, Joseph's supervisor, Paul Ploog, informed Joseph via email that he was required to complete four additional trainings, which included the CRT and Gender Identity Trainings, even though he had completed all the basic workplace harassment training already administered to all employees.[26] In August 2020, Aaron was informed by Luke Pherson, who was not even Aaron Norgren's own supervisor at the time, that he was required to complete additional trainings, which included the CRT and Gender Identity Trainings as well.[27]

The Norgrens sought exemptions from these trainings. Aaron sought exemptions from his direct supervisor, Robert Schweisthal, and the Director of Equal Opportunity and Access Division at DHS, Zecharias Hailu.[28] Joseph sought exemptions from his supervisor, Ploog, and then Carol Olson and Scott Melby, then Denise Considine, and then Hailu.[29] Defendants denied the Norgrens any exemption.[30]

---

[25] *E.g.,* J.App.004, 006, R. Doc. 1 at 4, 6, Compl. ¶¶ 17, 22-23 (Aaron).

[26] J.App.079, R. Doc. 15 at 3, Am. Compl. ¶ 12 (Joseph).

[27] J.App.003, R. Doc. 1 at 3, Compl. ¶ 13 (Aaron).

[28] J.App.006, R. Doc. 1 at 6, Compl. ¶¶ 22, 25 (Aaron).

[29] J.App.082, R. Doc. 15 at 6, Am. Compl. ¶¶ 23-24 (Joseph).

[30] J.App.006, R. Doc. 1 at 6, Compl. ¶ 26 (Aaron); J.App.082, R. Doc. 15 at 6, Am. Compl. ¶ 24 (Joseph).

8

## V. DHS Created a Hostile Work Environment for Christians and Those Who Support Title VII's View of Racial Equality.

The trainings were not the first time the Norgrens had been subjected to hostility for their religious beliefs and views on racial equality. Prior to the forced trainings, on October 12, 2018, Joseph was working an overtime night shift at the Security Hospital. Joseph's then-supervisor Pherson had been talking with another employee about politics, including *Roe v. Wade*, the U.S. Constitution, and gender identity.[31] Pherson asked Joseph how many genders existed. Pherson was Joseph's supervisor, and he was on shift, so out of deference for his supervisor, Joseph felt like he had no choice but to answer. Joseph stated that only two genders and two sexes existed, based on his research in DNA and biology. Pherson grew angry and told Joseph that "his God" made them that way, despite Joseph not mentioning his religious beliefs at that point in the conversation.[32] Pherson targeted Joseph's speech and religion and told Joseph that he could be fired for the way he thought and spoke.[33] From that point on, both Joseph and Aaron noticed a difference in how they were treated as employees, and they avoided supervisors for fear of termination due to their beliefs.[34]

---

[31] J.App.082, R. Doc. 15 at 6, Am. Compl. ¶ 27 (Joseph).

[32] J.App.082-083, R. Doc. 15 at 6-7, Am. Compl. ¶ 28 (Joseph).

[33] J.App.083, R. Doc. 15 at 7, Am. Compl. ¶ 28 (Joseph).

[34] J.App.083, R. Doc. 15 at 7, Am. Compl. ¶ 29 (Joseph); J.App.007, R. Doc. 1 at 7, Compl. ¶ 32 (Aaron).

9

Thereafter, both Norgrens endured months of weekly communications and videos sent out by DHS that contradicted the principles of equality in the Constitution and under Title VII. Despite their fear of termination, they did voice their dissent against indoctrination of this sort to their supervisors.[35] The CRT Training and Gender Identity Training described above exacerbated the hostile environment at DHS and made it virtually unbearable.

## VI. Appellees' Hostile Environment and Their Refusal to Exempt Joseph from the Trainings Force Him to Prematurely Retire.

As noted above, the trainings were imposed on the Norgrens in August 2020. In September 2020, Ploog again told Joseph that he must complete the trainings, and Joseph requested an exemption.[36] On October 6, 2020, with no exemption in hand, Joseph informed DHS that he was planning to retire.[37] As Joseph alleges in his Amended Complaint, he would not have retired for three more years but for the

---

[35] J.App.007, R. Doc. 1 at 7, Compl. ¶ 34 (Aaron); J.App.083, R. Doc. 15 at 7, Am. Compl. ¶ 31 (Joseph).

[36] J.App.073-074, R. Doc. 12-1 at Ex. A, Decl. of Kathleen Ghreichi, Ex. A. Joseph objected to the insertion of this affidavit below, as it was introduced in an attempt to create a fact dispute related to Joseph's claim of constructive discharge. The district court relied on the timing of the emails in the Ghreichi Declaration to hold that Joseph was not constructively terminated. J.App.108-109, R. Doc. 38 at 10-11, Order at 10-11 (Joseph). Joseph does not dispute the authenticity of the attachments to the Ghreichi Declaration; rather, Appellant disputes their relevance to, and inclusion in, this Rule 8/12 record.

[37] J.App.075-076, R. Doc. 12-1 at Ex. B, Ghreichi Decl. Ex. B.

hostile environment created by DHS.[38] Later, on October 27, 2020, DHS denied Joseph's request for an exemption.[39] On October 30, Joseph objected to that denial, which was, essentially, the straw that broke the camel's back, and asked if he could appeal the decision.[40] DHS said there would be no appeal.[41] Joseph then stated that the failure to accommodate his sincere religious beliefs "solidified and confirmed" that he would "prematurely separate" because of the "hostile and uncomfortable work environment" created by his experiences at DHS, including the trainings and weekly videos.[42] Norgren had not intended to retire before he had reached thirty years of employment so that he would be eligible to receive a higher earned pension, but he could no longer tolerate the hostile environment created by DHS and Commissioner Harpstead's actions.[43] Joseph timely filed a charge of discrimination in the EEOC on June 26, 2021.[44]

---

[38] J.App.084, R. Doc. 15 at 8, Am. Compl. ¶¶ 35-36 (Joseph).

[39] J.App.095, R. Doc. 15-1, Am. Compl. Ex. A p. 2 (Joseph).

[40] *Id.*

[41] J.App.094, R. Doc. 15-1, Am. Compl. Ex. A p. 1 (Joseph).

[42] *Id.*

[43] J.App.084, R. Doc. 15 at 8, Am. Compl. ¶ 35 (Joseph).

[44] J.App.084, R. Doc. 15 at 8, Am. Compl. ¶ 37 (Joseph).

Appellate Case: 23-1207     Page: 19     Date Filed: 03/28/2023 Entry ID: 5259091

## VII. Appellees Refuse to Exempt Aaron from the Trainings, Continue Their Hostile Treatment of Aaron, and Deny Him Job Opportunities Because He Asserted His Beliefs and Legal Rights.

Like his father Joseph, Aaron sought an exemption from the CRT and Gender Identity Trainings.[45] DHS denied his request for an exemption, told him there was no appeal available, and forced him to take the trainings.[46]

Aaron experienced several instances of discrimination following his opposition to the trainings. For example, after Aaron vocalized his disagreement with and opposition to the trainings, he was denied the day off when attempting to call in for bad weather.[47] This benefit was routinely afforded to other employees without question.[48] Aaron complained because of the unfairness of treating him differently, and it took DHS a month of review and multiple levels of supervisors at DHS to finally retroactively allot him the day off.[49] In fact, Patrick Patterson from Human Resources maintained the position that Aaron should have been denied the day off.[50]

The discrimination and retaliation continued. In February 2021, Aaron applied for a temporary position of Group Supervisor Assistant, Administrative on Duty

---

[45] J.App.006, R. Doc. 1 at 6, Compl. ¶ 25 (Aaron).

[46] *Id.* ¶¶ 26-28.

[47] J.App.007-008, R. Doc. 1 at 7-8, Compl. ¶¶ 35-36 (Aaron).

[48] *Id.*

[49] J.App.008, R. Doc. 1 at 8, Compl. ¶ 36 (Aaron).

[50] *Id.*

Supervisor (ADOS), for which he was deemed qualified, and so was accepted for an interview; however, due to a scheduling conflict, he could not proceed with the interview process at that time.[51] Despite this, the Administrative Operations Director for DHS, Ted Wondra, encouraged him to apply again once the permanent position was posted.[52]

Thereafter, on June 25, 2021, Aaron filed a charge of discrimination against DHS in the Equal Employment Opportunity Commission ("EEOC Charge") based on the discrimination and retaliation he had experienced.[53] At about the same time, after filing the EEOC Charge, Aaron took Director Wondra's advice and applied in June 2021 for the permanent position, and he submitted the *exact same* resume and qualifications as in the February 2021 application.[54] Aaron met the experience requirement for the position through his nine years at DHS, his supervisory experience in the military, and his bachelor's degree in criminal justice.[55] The only difference between his February and June applications was Aaron's filing of his EEOC Charge against DHS. On July 16, 2021, Patrick Patterson from the Human

---

[51] J.App.019; R. Doc. 1-1, Compl. Ex. A (Aaron). A typo in the Complaint states that Aaron's initial application for the temporary position was in June 2021, but as Exhibit A indicates, it was in February 2021.

[52] *Id.*

[53] J.App.008, R. Doc. 1 at 8, Compl. ¶ 37 (Aaron).

[54] J.App.008, R. Doc. 1 at 8, Compl. ¶ 41 (Aaron).

[55] J.App.009, R. Doc. 1 at 9, Compl. ¶¶ 43-46 (Aaron).

Appellate Case: 23-1207     Page: 21     Date Filed: 03/28/2023 Entry ID: 5259091

Services Department informed Aaron that he did not meet the minimum qualifications of the job posting and was thus ineligible for the position or even an interview—the opposite result from Aaron's February experience.[56] After this instance of discrimination and retaliation, Aaron filed an Amended Charge on November 8, 2021.[57]

## VIII. Procedural History

On May 20, 2022, the EEOC gave Aaron his right-to-sue notice.[58] On August 15, 2022, Aaron timely filed his complaint in the district court.[59] On January 3, 2022, the EEOC gave Joseph his right-to-sue notice.[60] On February 25, 2022, Joseph timely filed his complaint in the district court.[61] Joseph amended his complaint on April 20, 2022.[62] In the district court, Appellees moved to dismiss all of Appellants' claims, and the district court granted the motions to dismiss.[63] The district court entered final judgments as to the claims on January 4, 2023.[64] Thereafter, Appellants

---

[56] J.App.009, R. Doc. 1, at 9, Compl. ¶ 42 (Aaron).

[57] J.App.009, R. Doc. 1, at 9, Compl. ¶ 49 (Aaron)

[58] J.App.021, R. Doc. 1-2. Compl. Ex. B (Aaron).

[59] J.App.001, R. Doc. 1, Compl. (Aaron).

[60] J.App.096, R. Doc. 15-2, Compl. Ex. B (Joseph).

[61] J.App.049, R. Doc. 1, Compl. (Joseph).

[62] J.App.077, R. Doc. 15, Am. Compl. (Joseph).

[63] J.App.030, R. Doc. 22, Order (Aaron); J.App.099, R. Doc. 38, Order (Joseph).

[64] J.App.046, R. Doc. 23, Judgment (Aaron); J.App.117, R. Doc. 39, Judgment (Joseph).

14

timely appealed the district court's judgments to this Court.[65]

Appellants have raised three issues on appeal related to the dismissal of the following counts of each complaint: for Aaron, Counts II (Title VII religious discrimination—failure to promote and disparate treatment), III (Title VII retaliation), and IV (First Amendment retaliation and compelled speech); for Joseph, Counts II (Title VII religious discrimination—termination), and IV (First Amendment retaliation and compelled speech).

## SUMMARY OF THE ARGUMENT

Aaron and Joseph Norgren filed these lawsuits because Appellees DHS and Harpstead discriminated and retaliated against them because of their Christian beliefs, opposition to DHS' offensive training requirements, and because they sought to redress their grievances through the EEOC administrative process. The Norgrens have a right to work for a state employer while remaining true to their religious beliefs. They cannot be forced to repeat racist propaganda and use pronouns inconsistent with another employee's biological sex based on DHS' preference for those thoughts and behaviors. Yet the district court's decision would allow DHS and Commissioner Harpstead to do just that.

As the Norgrens will show in this brief, the district court applied an inappropriate,

---

[65] J.App.048, R. Doc. 24, Notice of Appeal (Aaron); J.App.119, R. Doc. 40, Notice of Appeal (Joseph).

summary-judgment-like standard at the pleading stage—one that employees asserting discriminatory conduct by an employer can hardly be expected to meet. The Norgrens' pleadings plausibly allege causes of action sufficient under Rule 8 and Rule 12 to survive a motion to dismiss on each appealed count. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Norgrens alleged facts that, when substantiated in discovery, would easily allow a jury to conclude that DHS and Commissioner Harpstead are liable for their conduct. Both Aaron and Joseph alleged that they were treated differently after Supervisor Luke Pherson told Joseph that he could be fired for expressing views on human sexuality consistent with orthodox Christianity.[66] Thereafter, both Aaron and Joseph were forced to complete a CRT and Gender Identity Training which explicitly required them to take certain actions in response to those trainings.

These actions include (i) a full minute of silence for the murder of George Floyd; (ii) refraining from saying "I'm not a racist"; (iii) admitting that the United States is the root of purportedly racist ideas, such as equality under law and nondiscrimination; (iv) using another employee's chosen pronouns which are different from their biological sex; and (v) not telling another employee that their "gender identity" is wrong.[67] Because Aaron and Joseph are Christians and adhere

---

[66] J.App.082-083, R. Doc. 15 at 6-7, Am. Compl. ¶ 28 (Joseph).

[67] *E.g.,* J.App.003-006, R. Doc. 1 at 3-6, Compl. ¶¶ 14-23 (Aaron).

16

to traditional views of equality and human sexuality as informed by their faith, their beliefs are incompatible with the indoctrination the DHS required its employees to imbibe without objection. Yet DHS rejected their exemption requests from the trainings which so instructed them.

These forced trainings, coupled with months of messaging from DHS and Commissioner Harpstead establishing an anti-Christian environment at DHS, forced Joseph to retire three years earlier than he would have.[68] And after Aaron objected to these trainings and sought an exemption, he was treated differently from others when seeking a simple day off because of inclement weather. To make things worse, after Aaron filed an EEOC charge, he was suddenly not qualified for a position that he was previously told he qualified to obtain.[69]

Title VII and the First Amendment protect the Norgrens from such treatment. For centuries now, people have come to this country from every corner of the world to share in the blessing of religious freedom. Our Constitution promises that they may worship in their own way, without fear of penalty or danger, and that is a momentous offering. DHS and Commissioner Harpstead have denied the Norgrens that offering. This Court should reverse the district court and send this case forward into discovery.

---

[68] J.App.094, R. Doc. 15-1, Am. Compl. Ex. A p. 1 (Joseph).

[69] J.App.007-008, R. Doc. 1 at 7-8, Compl. ¶¶ 35-36 (Aaron); J.App.019; R. Doc. 1-1, Compl. Ex. A (Aaron); J.App.009, R. Doc. 1, at 9, Compl. ¶ 42 (Aaron).

Appellate Case: 23-1207     Page: 25     Date Filed: 03/28/2023 Entry ID: 5259091

## ARGUMENT

### I.  Standard of Review for All Claims

This is an appeal from a judgment of dismissal under Fed. R. Civ. P. 12(b)(6). This Court reviews the district court's decision *de novo*, assuming all factual allegations are true and construing all reasonable inferences in favor of the Norgrens. *Usenko v. MEMC, LLC*, 926 F.3d 468, 472 (8th Cir. 2019). To survive a 12(b)(6) motion, a claim must merely be "plausible on its face." *Id.* While a party must show that success on the merits is more than a "sheer possibility," it is not a "probability requirement." *Id*. A complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [liability]." *Twombly*, 550 U.S. at 556. The Court's determination of whether a plaintiff has met this standard is "context-specific" and requires it to "draw on its judicial experience and common sense." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (en banc) (quoting *Iqbal*, 556 U.S. at 678).

Context is king here, as this is a Title VII case. In Title VII cases, this Court applies the *McDonnell Douglas* burden-shifting framework. *See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). As part of the *McDonnell Douglas* analysis at the Rule 12 stage, "it is not appropriate to require a plaintiff to plead facts

18

establishing a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Rather, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*, which in turn reduces the facts needed to be *pleaded* under *Iqbal*." *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (internal marks omitted) (emphasis in original) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 309, 316 (2d Cir. 2015)).

## II. Aaron Pleaded Sufficient Facts to Support His Claim for Title VII Retaliation Against DHS.

Aaron has pleaded sufficient facts to establish each element of a retaliation claim at the Rule 12 stage. To plead a prima facie case of retaliation under Title VII, a plaintiff must allege that (1) "he engaged in protected activity;" (2) "he suffered a materially adverse action that would deter a reasonable employee from making a charge of employment discrimination;" and (3) "there is a causal connection between the protected activity and the adverse action." *Gibson v. Am. Greetings Corp.,* 670 F.3d 844, 856 (8th Cir. 2012). He has alleged all three elements.

Aaron alleged that he objected to and sought an exemption from DHS' CRT and Gender Identity Trainings,[70] and soon thereafter he suffered retaliation when DHS refused to give him the day off because of weather despite the common practice of

---

[70] J.App.006, R. Doc. 1 at 6, Compl. ¶ 25 (Aaron).

allowing just that.[71] Aaron also alleged that he was told he was qualified for a new temporary position,[72] then filed a charge of discrimination, and within 3 weeks thereafter he was told he was not qualified for the same position in permanent form.[73] Aaron's seeking an exemption and filing an EEOC charge are both protected activities. The failure to give Aaron a day off for inclement weather and failure to promote him are materially adverse employment actions.[74] Aaron alleged that his protected activity caused the failure to give him a day off and failure to promote him, and he included allegations of the temporal proximity of these actions and DHS' sudden and otherwise inexplicable negative behavioral changes toward him as supporting but-for causation. These allegations of retaliation meet the Rule 8 standard for either Title VII or section 1983 retaliation claims.

Despite these allegations, the district court held that Aaron failed to support a plausible inference of but-for causation because the minimum qualifications for the permanent Group Supervisor Assistant position were more rigorous than the temporary position.[75] But that is irrelevant if Aaron was qualified for both, which he

---

[71] J.App.007-008, R. Doc. 1 at 7-8, Compl. ¶¶ 35-36 (Aaron).

[72] J.App.019; R. Doc. 1-1, Compl. Ex. A (Aaron).

[73] J.App.008, R. Doc. 1 at 8, Compl. ¶ 41 (Aaron).

[74] The district court did not dispute that Aaron had pleaded the first two elements of a retaliation claim.

[75] J.App.039; R. Doc. 22 at 10, Order 10 (Aaron).

20

alleges he was. As Aaron alleged, he was encouraged to apply for the permanent position, which indicates that his combination of education and experience was sufficient for the position. As Aaron also alleged, both the permanent and temporary position afforded those deciding on the position the same discretion to combine experience and education to meet the minimum requirements. Finally, Aaron alleged that he met those minimum requirements and that he "had been considered previously for other positions throughout DHS with the same minimum mandatory, not preferred, qualifications."[76]

To hold otherwise, the district court made a fact determination, contrary to the allegations in the Complaint, that the qualifications for the permanent position could not be satisfied through the same discretionary method allowed for the temporary position. The district court also entirely *discounted* Aaron's explicit allegation that he had been considered in the past for other equivalent positions—the court went so far as to demand proof. This is error under Rule 12. The level of specific proof demanded by the district court is a burden that is not imposed upon a plaintiff-employee until after an employer has propounded a nondiscriminatory reason for the employment action at the summary judgment stage. *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 981 (8th Cir. 2001).

---

[76] J.App.009, R. Doc. 1 at 9, Compl. ¶ 46 (Aaron).

Appellate Case: 23-1207    Page: 29    Date Filed: 03/28/2023 Entry ID: 5259091

The district court likewise erred by discarding the temporal proximity of Aaron's protected activity and DHS' materially adverse conduct. At this stage, Aaron does not need to *establish* causation with facts admissible in evidence; rather, he must merely *plead* it. *Wilson*, 850 F.3d at 372. Aaron's case is very similar to *Wilson* in this respect. In *Wilson*, this Court held that a plaintiff-employee who filed an EEOC charge and was terminated six weeks later "plausibly alleges a but-for causal connection." *Id.* at 373. Here, Aaron filed an EEOC charge in June 2021 and was then denied even the *opportunity to interview* for a position he was encouraged to seek just three weeks after his EEOC charge was filed.

The court below supported its conclusion that mere "coincidence" is insufficient by citing to *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 896 (8th Cir. 2002).[77] But reliance on *Kipp* to reach such a conclusion is inappropriate in the face of other more relevant precedent, such as *Wilson*. In addition to *Wilson*, this Court has stated that "[a] temporal connection between the protected conduct and adverse action may be sufficient to establish a prima facie case where the proximity is 'very close.'" *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1169 (8th Cir. 2019) (*quoting Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*). This Court and other federal circuits and districts have

---

[77] J.App.039; R. Doc. 22 at 10, Order at 10 (Aaron).

Appellate Case: 23-1207    Page: 30    Date Filed: 03/28/2023 Entry ID: 5259091

repeatedly held that a temporal proximity of between two to six weeks, and even as long as 46 days, is close enough, by itself, to raise the inference of retaliation.[78]

Aaron's Complaint sets out the sequence of events to demonstrate that his EEOC Charge and DHS' subsequent adverse actions—only three weeks separated the two—were not merely coincidental. Aaron's additional training requirement was announced in August 2020, after which he voiced his opposition. Then, in February 2021, he applied for the temporary position and, on March 1, 2021, had the encouraging email exchange with Wondra.[79] He brought his EEOC Charge regarding his denial of PTO on June 25, 2021.[80] The permanent position was posted in June 2021, at which time Aaron applied for it. Shortly thereafter, on July 16, DHS

---

[78] *See, e.g., Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (two weeks between protected conduct and adverse action sufficient to establish *prima facie* case); *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (choosing tolling of time most favorable to plaintiff on summary judgment motion); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007) (holding that an adverse action that "followed closely" one month after a discrimination complaint can raise an inference of causation for a jury); *Lang v. Ill. Dep't of Children & Family Servs.,* 361 F.3d 416, 419 (7th Cir. 2004) (finding one month short enough time to reinforce an inference of retaliation); *Patton v. Forest River*, No. 3:18-CV-419 DRL-MGG, 2020 U.S. Dist. LEXIS 27029, at *36 (N.D. Ind. Feb. 18, 2020) (finding one-month interval suspicious timing); *Brown v. Chi. Transit Auth.*, No. 17 cv 08473, 2020 U.S. Dist. LEXIS 27222, at *35 (N.D. Ill. Feb. 14, 2020) (finding two-month interval was a "temporal nexus [] close enough to raise an inference of retaliation."); *Jones v. Alpha Rae Pers., Inc.*, 903 F. Supp. 2d 680, 686 n.3 (N.D. Ind. 2012) (stating that forty-six days "is right at the outer boundary of what might be considered suspicious timing").

[79] J.App.019; R. Doc. 1-1, Compl. Ex. A (Aaron).

[80] J.App.008, R. Doc. 1 at 8, Compl. ¶ 37 (Aaron).

23

denied Aaron the opportunity to interview.

*Kipp* is simply different. *Kipp* involved a two-month gap between the plaintiff's complaint and termination. Here, the interval is approximately three weeks, from June 25 to July 16, 2021. *Kipp* also stated that the Eighth Circuit has "held that evidence that gives rise to 'an inference of retaliatory motive' on the part of the employer is sufficient to establish a causal link." 280 F.3d at 897. Aaron's allegations give rise to that inference. It was error to dismiss Aaron's claim by characterizing the material factor of temporal proximity as mere coincidence. All in all, even *Kipp* militates against a dismissal of Aaron's claims at the pleading stage. The Court should reverse the dismissal of Aaron's Title VII retaliation claim.

### III. The Norgrens Adequately Pleaded Claims for Title VII Religious Discrimination.

A plaintiff asserting a Title VII claim for religious discrimination must show either direct evidence of a Title VII violation or an inference of discrimination or retaliation under the *McDonnell Douglas* burden-shifting framework. *See Fiero*, 759 F.3d at 878. Disparate treatment claims under Title VII based on indirect evidence ordinarily are analyzed under the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of religious discrimination, a plaintiff must show: (1) she is a member of a protected class because of her religious beliefs, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Shirrell v. St.*

24

*Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015); *see also McDonnell Douglas Corp.*, 411 U.S. at 802.

Because these are fact-sensitive elements, this test is examined more rigorously at the summary judgment phase, but the burden at the pleading stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). In fact, the Supreme Court "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz*, 534 U.S. at 511. This Court has followed the Supreme Court's lead, making clear that the "elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (quotations omitted). Rather, the elements are "part of the background against which a plausibility determination should be made," and "may be used as a prism to shed light upon the plausibility of the claim." *Id*. (quotations omitted).

First, as to both Aaron and Joseph, they are both devout Christians, making them each a member of a protected class. *See Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366-67 (7th Cir. 2009). Second, there is no dispute that they have met their employer's legitimate expectations for their work, and they have each alleged that

25

they have not experienced any complaints about their work.[81] Further, Aaron alleged that DHS failed to promote him, which is an adverse employment action.[82] *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006).

The disputed issues in this *prima facie* analysis are whether Joseph suffered an adverse employment action and whether, for both Norgrens, the circumstances give rise to an inference of discrimination. Appellants submit that they have adequately pleaded these elements, contrary to the district court's holding.

### A. Aaron adequately pleaded that DHS failed to promote him because of his religious beliefs and expression.

An inference of discrimination can arise where there is an allegation and plausible inference that "the adverse action was connected to [the plaintiff's] protected characteristics." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022). All a plaintiff needs to do to survive the Rule 12 stage in an employment discrimination claim is to "assert that she was treated worse because of protected characteristics." *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021). That's it. In fact, a plaintiff "certainly does not need to identify . . . a similarly situated employee who managed to avoid [adverse employment action]." *Kaminski*, 23 F.4th at 777.

---

[81] J.App.009, R. Doc. 1 at 9, Compl. ¶ 48 (Aaron); J.App.084, R. Doc. 15 at 8, Am. Compl. ¶ 34 (Joseph).

[82] J.App.009, R. Doc. 1 at 9, Compl. ¶ 47 (Aaron).

26

The district court required far more. It erroneously held that Aaron did not adequately allege an inference of discrimination arising from the failure to promote him. In doing so, the district court held insufficient Aaron's allegation that "[o]ther similarly situated employees, who are not in the same protected class as Plaintiff, were not denied the opportunity for such a promotion."[83] The court said this allegation was "threadbare" and "conclusory."[84] The court did not consider Aaron's allegations that he opposed the Gender Identity Training, that he believes that God creates only two sexes and two genders, that he requested a religious exemption from the trainings, that he vocalized disagreement with the trainings, that he filed a charge of discrimination because of religious discrimination against him, that he met all of the qualifications for the position he sought, and yet DHS denied him the opportunity to even interview despite his qualifications.[85]

The reader can infer from these allegations that non-Christians with similar qualifications to Aaron were not denied the opportunity to obtain the promotion that Aaron sought. These allegations certainly give DHS notice as to what Aaron's claims are.

At the pleading stage, without being able to force the employer to divulge

---

[83] J.App.011, R. Doc. 1 at 11, Compl. ¶ 65 (Aaron).

[84] J.App.037, R. Doc. 22 at 8, Order at 8.

[85] *See supra* nn. 45-57.

Appellate Case: 23-1207    Page: 35    Date Filed: 03/28/2023 Entry ID: 5259091

employment information of other employees to see who applied, who was interviewed, and who got the job, asking for more is too much. It is nearly impossible at this stage for an employee to plead those kinds of facts without compulsory discovery. Discovery can provide the relevant comparable factors, which include employees with (1) the same job description, (2) subject to the same standards, (3) had the same supervisor, and (4) had comparable experience, education, and other qualifications. *E.E.O.C. v. Kohler Co.,* 335 F.3d 766, 775-76 (8th Cir. 2003). Not surprisingly, this standard is often analyzed and applied in the context of *summary judgment. See, e.g. Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013); *Lee v. K Mart Corp.,* 836 F. Supp. 841, 845 (D. Minn. 2011); *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019); *Coleman v. Donahoe*, 667 F.3d 835, 849 (7th Cir. 2012).[86]

DHS discriminated against Aaron by denying him the opportunity for a promotion to the permanent Group Supervisor Assistant Position because he (i) engaged in the protected activity of objecting to the Gender Identity Training and (ii) filed a charge with the EEOC because of the increasing hostility and

---

[86] As one court has wisely noted, "[t]oday's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it." *Wright v. Winnebago Industries, Inc.*, 551 F. Supp. 2d 836, 844 (N.D. Iowa 2008). Employers are not foolish enough to leave evidence, so "[e]mployment discrimination and retaliation, except in the rarest cases, is [sic] difficult to prove." *Id.* Discovery addresses these disadvantages.

Appellate Case: 23-1207     Page: 36     Date Filed: 03/28/2023 Entry ID: 5259091

discrimination he encountered after expressing his religious views at work and his religious objections to DHS' indoctrination.[87] Aaron alleged that similarly situated employees who were not in the same protected class were not denied the opportunity for such a position. *Id*. The district court erred by dismissing Aaron's Title VII religious discrimination claim.

### B. Joseph adequately pleaded that he was constructively discharged because of his religious beliefs.

Similarly, Joseph adequately pleaded that he suffered an adverse employment action and that DHS discriminated against him in a way that was "distinct from other similarly situated employees due to his specific religious beliefs[.]"[88] The district court erroneously held that Joseph was not constructively discharged and did not plead facts giving rise to an inference of discrimination.[89] A plain reading of Joseph's Amended Complaint does not support those conclusions.

1. DHS constructively discharged Joseph.

First, Joseph adequately pleaded that he was constructively discharged. Constructive discharge, like actual discharge, is a materially adverse employment action. *See, e.g.*, *Fitzgerald v. Henderson,* 251 F.3d 345, 357-58 (2d Cir. 2001). "A constructive discharge occurs when an employee resigns after the employer has

---

[87] J.App.011; R. Doc. 1 at 11, Compl. ¶¶ 60-67 (Aaron).

[88] J.App.087-088; R. Doc. 15 at 11-12, Am. Compl. ¶¶ 59-62 (Joseph).

[89] J.App.108-109; R. Doc. 38 at 10-11, Order 10-11 (Joseph).

Appellate Case: 23-1207    Page: 37    Date Filed: 03/28/2023 Entry ID: 5259091

created an intolerable working environment in a deliberate attempt to compel such a resignation." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004). To demonstrate constructive discharge, the plaintiff must show that he was forced to resign because the working conditions, from the standpoint of the reasonable employee, had become unbearable. *See, e.g.*, *Hukkanen v. Int'l Union,* 3 F.3d 281, 284 (8th Cir. 1993); *Lindale v. Tokheim Corp.,* 145 F.3d 953, 955 (7th Cir. 1998).

At summary judgment, evidence of the employer's intent can be proven "through direct evidence or through evidence that the employer could have reasonably foreseen that the employee would quit as a result of its actions." *Fercello v. Cnty. of Ramsey,* 612 F.3d 1069, 1083 (8th Cir. 2010). It is an objective, not a subjective, test. *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009).

In the analogous Title VII discrimination context, courts have determined that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22-23 (1993). These may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Id*. at 23. The constructive discharge analysis is highly fact sensitive, requiring a detailed factual inquiry which is typically inappropriate at the pleadings stage of the proceedings.

30

Thus, at the Rule 12 stage, a plaintiff need not *prove* he was constructively discharged; rather, he must *plead* enough facts to "raise a reasonable expectation that discovery will reveal evidence of the alleged conduct." *Green v. Potter*, No. 10-cv-02201-LTB-KMT, 2011 U.S. Dist. LEXIS 74981, at *10 (D. Colo. Jul. 12, 2011) (citing *Twombly*, 550 U.S. at 556). In *Green*, for example, it was enough for a plaintiff to (i) provide dates and descriptions of the plaintiff's protected conduct, (ii) provide dates, places, and actors related to the defendants' conduct that, if proven, would violate the plaintiff's Title VII protections, (iii) and provide circumstances leading up to the plaintiff's resignation that plausibly show his resignation was objectively involuntary. *Id.* at *11.

The Fifth Circuit's decision in *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140 (5th Cir. 1975), is instructive here. In *Young*, the plaintiff was an atheist who became employed with the defendant in February 1971. *Id.* at 141-42. She was required to attend monthly staff meetings which started with a religious prayer by Protestant Christian ministers. *Id.* at 142. She attended the February and March 1971 meetings. *Id.* Then, however, the plaintiff resolved to not attend these meetings because she felt her freedom of conscience was being violated by being forced to attend. *Id.* She was able to slide by without having to attend the meetings until the September 1971 meeting, at which her absence was noted. *Id.* She was then told that the primary purpose of the meetings was business, and if she

31

objected to the prayer, then she could simply "close [her] ears" during that time. *Id.* She repeated her objection, and her employer told her the meetings were mandatory and that he would "leave the decision to her." *Id.* At closing time that day, she told her employer that she was turning in her keys and leaving. *Id.* The employer asked for a letter of resignation, and she refused, saying "No, I am being fired." *Id.*

The Fifth Circuit held that these facts sufficiently established a hostile work environment that created a constructive discharge:

> It is true that there is no evidence of proselytization by Southwestern here and that the course of events leading to Mrs. Young's departure was rather too swift and spontaneous to admit any inference of an "atmosphere of religious intimidation." However that may be, we believe that the district court required rather too high a standard for a constructive discharge. The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.
> . . . .
> In this case, Mrs. Young enjoyed her work and Southwestern valued her services. The only possible reason for her resignation on September 15, 1971, was her resolution not to attend religious services which were repugnant to her conscience, coupled with the certain knowledge from Bostain, her supervisor, that attendance at the staff meetings – in their entirety – was mandatory and the reasonable inference that if she would not perform this condition of her employment, she would be discharged. In these circumstances, when she could hope no longer that her absence at the meetings would not be noticed, she could reasonably infer that in one week, one month or two months, she would be discharged because of the conflict between her religious beliefs and company policy. Surely it would be too nice a distinction to say that Mrs. Young should have borne the considerable emotional discomfort of waiting to be fired instead of immediately terminating her

32

association with Southwestern. This is precisely the situation in which the doctrine of constructive discharge applies, a case in which an employee involuntarily resigns in order to escape intolerable and illegal employment requirements.

*Id.* at 143-44.

*Young* is an excellent analogy to this case. Here, DHS Supervisor Pherson told Joseph in October 2018 that holding his beliefs about gender identity placed his continued employment in jeopardy.[90] Joseph pleaded that after that exchange, there was a noticeable difference between how he and Aaron were treated as employees at their place of work.[91] Joseph also pleaded that he was forced to take mandatory trainings that included: (i) an express requirement that he adopt a revisionist view of race in the United States that departs from the equal justice principles of Title VII, (ii) a directive to stop saying that he is not a racist, (iii) a requirement to confess to supporting racist policies by virtue of supporting the United States, (iv) a demand to change his beliefs and actions related to race issues, (v) a requirement to use the gender pronouns chosen by a person which are different from that person's biological sex, and (vi) a prohibition on saying that another person's gender identity is wrong.[92]

Joseph enjoyed his work and had performed it well for 27 years. But the writing

---

[90] J.App.082-083, R. Doc. 15 at 7-8, Am. Compl. ¶¶ 27-28 (Joseph).

[91] J.App.083, R. Doc. 15 at 8, Am. Compl. ¶ 29 (Joseph).

[92] J.App.079-081, R. Doc. 15 at 3-5, Am. Compl. ¶¶ 12-21 (Joseph).

33

was on the wall: he was refused an accommodation that would exempt him from the trainings.[93] He could not continue to work in a hostile environment where the threat of termination for his religious beliefs was around every corner. He was constructively discharged, which is a materially adverse employment action against him.

2. Joseph adequately pleaded that he suffered intentional discrimination because of his religious beliefs.

DHS refused to accommodate Joseph's objection to the Gender Identity Training, which DHS knew was based on Joseph's religious beliefs, and thus forced him out because of his religious beliefs. Joseph has adequately pleaded that DHS discriminated against him because of his religious beliefs. The inference which arises from Joseph's Amended Complaint include that DHS discriminated against him, and did so intentionally.

For an employee to adequately allege an inference of discrimination, "it is not necessary that the incidents that surround the constructive discharge themselves constitute actionable religious discrimination; instead our focus is whether those incidents, and other supporting evidence, could support the reasonable inference that the alleged constructive discharge was based on religious discrimination." *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002). In addition, it is not

---

[93] J.App.082, R. Doc. 15 at 6, Am. Compl. ¶ 24 (Joseph).

always possible to come forward with comparator evidence, especially at the pleading stage of the case. And, sometimes, there might not be any comparators to help determine an employer's motivation for terminating an employee. As a result, federal courts encountering such circumstances have noted that "[a]n infinite array of statements, acts, or omissions can amount to direct or circumstantial evidence of discrimination due to a complainant's religion, even in the absence of a comparator." *Perdue v. C. Hager & Sons Hinge Mfg., Co.*, 412 F. Supp. 2d 1227, 1236 (M.D. Ala. 2005). Further, courts look to other statements or acts where, for example, "it is not clear that anyone else sought" the same religious accommodation. *Wharton v. Cnty. of Nassau*, No. 10-CV-0265(JS)(AKT), 2013 U.S. Dist. LEXIS 129127, at *29 (E.D.N.Y. Sep. 10, 2013).

*University of Chicago Hospitals* is instructive. There, the Seventh Circuit reversed a grant of summary judgment to the employer based on allegations of constructive discharge due to religious discrimination. 276 F.3d at 333. The court held that singling out an employee based on his religion through various actions, such as calling him a "religious fanatic" and stating a desire for termination, was sufficient to defeat summary judgment. *Id.* Likewise, in *Grubbs v. Arizona*, No. CV-20-02369-PHX-DJH, 2021 U.S. Dist. LEXIS 192150 (D. Ariz. Oct. 5, 2021), the plaintiff "was suspended without pay for three days on May 2, 2019, soon after voicing concerns about another employee and Plaintiff's religious beliefs. On the day

35

he returned, May 8, 2019, he resigned 'because the discrimination, hostility, and retaliation so intensified that it created an intolerable work environment.'" *Id.* at *9. These allegations alone were enough to give rise to an inference of discrimination "at the 12(b)(6) stage." *Id.*

Further, an employer must accommodate the religious beliefs of its employees where possible, and requiring them to "value" the beliefs of others in conflict with their own is impermissible. *Buonanno v. AT&T Broadband,* LLC, 313 F. Supp. 2d 1069 (D. Colo. 2004) (judgment awarded to employee under Title VII failure-to-accommodate theory because employer required employee to sign an anti-discrimination policy stating he would "value" the beliefs of employer and fellow co-workers).

Joseph's allegations easily meet this standard. Specifically, in his Amended Complaint, Joseph alleged that in October 2018, Supervisor Luke Pherson grew angry with him because of his views on gender identity and told him that he could be fired for the way he thought and spoke.[94] When he objected to the Gender Identity Training in 2020, his request for exemption was denied without any opportunity for accommodation. DHS was unwilling to even *attempt* to accommodate his beliefs, which means it did not treat him the same as those with the same work history and

---

[94] J.App.083, R. Doc. 15 at 7, Am. Compl. ¶ 28 (Joseph).

position who did not have a religious objection to the content of the training. The fact that DHS *requires* Gender Identity Training which is incompatible with orthodox monotheistic beliefs on gender and sex demonstrates an intentional animus toward Christians like Joseph. It does not appear that DHS requires those who believe gender identity and biological sex *can* be different to learn how to respect the views of those who follow the Torah, Bible, or Quran.[95] DHS constructively discharged and failed to accommodate Joseph.

The district court evaded the inferences arising from Joseph's Amended Complaint and held him to an impossible standard that the law does not impose upon him at this stage. He pleaded that he was subjected to hostility and threats due to his sincerely held religious beliefs; he pleaded that he sought a religious exemption from the training and its concomitant demands which were incompatible with his religious beliefs. In response, DHS gave him a one sentence refusal to accommodate. Sadly, this is unsurprising given DHS' intentional track: Commissioner Harpstead had declared that the training was intended to change "minds for life." *Id.*

---

[95] *E.g.,* Br. of *Amici Curiae* Religious Freedom Institute's Islam & Religious Freedom Action Team and Islamic Scholars in Support of Employers, p. 11, *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), available at https://www.supremecourt.gov/DocketPDF/17/17-1618/113485/20190823160352275_17-1618%20-1623%2018-107%20Amicus%20Brief%20Religious%20Freedom%20Institute.pdf ("Islam does not invidiously discriminate between men and women, but it does distinguish between the two.")

Joseph adequately pleaded the elements of religious discrimination resulting in his constructive discharge in his Amended Complaint. The Court should reverse on this count.

### IV. The Norgrens Have Pleaded Sufficient Facts to Support Their First Amendment Claims Against Commissioner Harpstead.

The First Amendment forbids the government from "[c]ompelling individuals to mouth support for views they find objectionable." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018). "After all, the 'choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control.'" *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654 (2000)). To establish a compelled speech claim, the Norgrens must show: "(1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman v. Thompson,* 798 F.3d 938, 951 (10th Cir. 2015).

The district court held that the Norgrens did not allege a plausible claim for compelled speech because (1) Commissioner Harpstead did not personally commit any constitutional violations, (2) the Norgrens did not allege facts supporting a compelled speech claim—specifically, they failed to allege facts to plausibly support the third element: that their speech was compelled by government action—and (3)

38

Commissioner Harpstead is entitled to qualified immunity.[96]

The district court was wrong to conclude that there are no allegations that Commissioner Harpstead ever compelled the Norgrens to make or refrain from making any statements relating to anti-racism or gender identity issues. The district court also wrongly held dispositive whether Commissioner Harpstead took action *in person* to impose the compelled speech. And the district court was wrong to extend qualified immunity to Commissioner Harpstead given the robust case law prohibiting government actors from compelling speech on matters of public concern with which employees personally disagree.

## A. Harpstead's policies and personal actions caused the Norgrens' constitutional injuries.

At the Rule 12 stage, the Norgrens must only plead that "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (citing *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)); *see also Dodds v. Richardson*, 614 F.3d 1185, 1195 n.3 (10th Cir. 2010) (observing that "[a] defendant-supervisor's

---

[96] J.App.040-044, R. Doc. 22 at 11-15, Order 11-15 (Aaron).

Appellate Case: 23-1207    Page: 47    Date Filed: 03/28/2023 Entry ID: 5259091

promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement.") (collecting cases). "In requiring a plaintiff to allege that each defendant was personally involved in the deprivation of his constitutional rights, [the court] assess[es] each defendant relative to his authority over the claimed constitutional violation." *Jackson*, 747 F.3d at 543.

Additionally, while "the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Id.*

The Norgrens have easily met this standard. The Norgrens alleged that Commissioner Harpstead created and implemented the policies at issue which caused their constitutional compelled-speech injuries, including the mandatory CRT and Gender Identity Trainings.[97] In addition, the Norgrens alleged that Commissioner Harpstead specifically—herself—told DHS employees to "focus on training" to have "brave conversations" to change their "minds for life."[98] The Norgrens alleged that Harpstead's personal involvement included implementing "DHS policy" "through multiple supervisors, ultimately resulting in" their

---

[97] J.App.089-090, R. Doc. 15 at 13-14, Am. Compl. ¶¶ 70-76 (Joseph).

[98] *E.g.,* J.App.007, 014, R. Doc. 1 at 7, 14, Compl. ¶¶ 33, 82 (Aaron).

respective adverse employment experiences,[99] which discrimination was (1) retaliation for their assertion of their religious and free speech rights, and (2) compulsion to silence them or else coerce them to conform their speech, thinking, and attitude to DHS policy.[100] These allegations are sufficient to demonstrate that Commissioner Harpstead is personally responsible for the constitutional violations at issue.[101]

The district court essentially set aside these allegations and required a different standard—that Commissioner Harpstead had to have "personal interactions with Norgren or . . . personal[] involve[ment] in his employment."[102] As cited above, this is not required where the policy at issue—here the trainings—are created and implemented by the higher-up. The district court also held that somehow, Aaron did not plead that Commissioner Harpstead "failed to supervise" those who

---

[99] *E.g.,* J.App.014, R. Doc. 1 at 14, Compl. ¶ 83 (Aaron).

[100] J.App.089-090, R. Doc. 15 at 13-14, Am. Compl. ¶¶ 70-76 (Joseph).

[101] Additionally, under Minnesota law, the Commissioner "shall have the authority to: (1) require county agency participation in training and technical assistance programs to promote compliance with statutes, rules, federal laws, regulations, and policies governing human services." Minn. Stat. § 256.01, subd. 2(a)(1). The Norgrens' employer, FMHP, is a regional treatment facility under the authority of the DHS Commissioner. *See* Minn. Stat. § 246.0135. The Norgrens' allegations align with the Commissioner's statutory mandates.

[102] J.App.112, R. Doc. 38 at 14, Order 14 (Joseph); *see also* J.App.041, R. Doc. 22 at 12, Order 12 (Aaron).

41

implemented the trainings.[103] It cannot be both—either Commissioner Harpstead implemented these policies which compelled the Norgrens' silence on some issues (don't say you're not a racist) and speech on others (use another person's chosen pronouns), or she failed to supervise those under her who went forward with this cultural revolution at DHS. Either way, the Norgrens pleaded facts which establish Commissioner Harpstead's "personal involvement" to the level required under section 1983.

This Court's decision in *Jackson v. Nixon* supports the Norgrens. In *Jackson*, an inmate was "required to attend" a treatment program to qualify for early parole, which he "he believed himself required to complete." 747 F.3d at 540. The inmate was an avowed atheist, and he objected to the religious components of the program, namely, that it "invoked religious tenets by using the serenity prayer and religious meditations." *Id*. (internal quotations omitted). In response to his objection, Jackson was advised to "'act as if,' a term used in the program, meaning to 'assume a role or attitude even if you don't feel like it' and further defined as '[a] tool used to assist one in 'trying on' new patterns of thought and behavior.'" *Id*. (citations omitted). Jackson further alleged that "[i]t is my assertion that I was being coerced by and through an atmosphere designed and intended to change or alter my thinking and

---

[103] J.App.041, R. Doc. 22 at 12, Order 12 (Aaron).

Appellate Case: 23-1207    Page: 50    Date Filed: 03/28/2023 Entry ID: 5259091

behavior." *Id*. (internal marks omitted).

Jackson sued, among others, the Missouri DOC Director, whom Jackson alleged "knew or should have known of the changes of Constitutional policy and how they [affected] inmate[s] like me under his jurisdiction." *Id.* at 544 (internal marks omitted). The *Jackson* Court stated that "[t]he authority of the state DOC director to make prison-wide policy decisions may be sufficient to give rise to liability under § 1983 ," and that, "[m]oreover, an allegation that the DOC director authorized an unconstitutional policy may be sufficient to state a claim 'for actions allegedly taken directly by' the director." *Id*. (quoting *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999)). Among other duties, the director was "'responsible for the implementation of uniform policies and procedures governing offenders and staff,' and he must 'make and enforce such rules, regulations, orders and findings as the director may deem necessary for the proper management of all correctional centers and persons subject to the department's control.'" *Id*. (quoting Mo. Rev. Stat. §§ 217.025 (3), (6)). The *Jackson* Court concluded that, "[g]iven [the director's] statutory duties, including those associated with administration of the [parole program], Jackson's complaint alleged sufficient personal involvement as to MDOC Director." *Id*. at 545.

The district court missed *Jackson*'s point, and *Jackson* demonstrates that the Norgrens' pleadings are sufficient to allege Harpstead's liability under section 1983. Here, Harpstead's statutory duties tie her personally to the "training" administered

at the county agency level in accordance with "policies governing human services." Minn. Stat. § 256.01, subd. 2(a)(1). No more personal involvement is necessary.

## B. Harpstead Compelled the Norgrens' Silence on Some Matters of Public Concern, and Their Speech on Others.

There is no dispute that the Norgrens alleged they were forced to speak or be silent on matters of public concern, and that they objected to these requirements. The district court held that the Norgrens only failed to plead that their speech was "compelled by some governmental action." *Cressman*, 798 F.3d at 951. The district court's analysis appears to lean heavily on the same errors discussed in the immediately prior section—that the Norgrens did not allege that "Harpstead ever compelled Norgren to make or refrain from making any statements relating to anti-racism or gender identity issues."[104]

Unless the district court's emphasis is on *Commissioner Harpstead*'s individual involvement, it is hard to imagine how the district court could have arrived at this conclusion. After all, the Norgrens' pleadings are replete with allegations that the CRT and Gender Identity Trainings, promulgated and required by Harpstead, compelled both speech and silence. Thus, to the extent the district court's analysis relates to the individual involvement of Commissioner Harpstead, it was wrong as a matter of law, as discussed above. But as to the sufficiency of the allegations of

---

[104] J.App.043, R. Doc. 22 at 14, Order 14.

compulsion, the decision below is simply wrong on the facts.

The Norgrens clearly alleged that DHS, at Harpstead's direction, required the Norgrens to take mandatory trainings, which trainings included within them specific directives on how to speak, think, and act.[105] The Norgrens alleged that the required CRT Training: "**mandate[d]**" a "full minute of **silence** for the murder of George Floyd;" "**instruct[ed]**" him "to **stop** using the phrase 'I am not a racist' or 'I can't be a racist' as a defense or denial" and that "to **remain silent** or be indifferent is racist"; "**told**" him "to **admit** the definition of racist as someone who supports racist policies or expresses racist ideas, **confess** to the racist policies and ideas he supports, and **accept** that the United States of America is the root of such racist ideas."[106] The Norgrens also alleged that their understanding was based on an email from the Assistant Commissioner of DHS.[107] As for the Gender Identity Training, the Norgrens alleged that it "instructed employees to **refrain** from telling others that their gender identity is wrong," and included the requirement to use the pronouns chosen by another individual regardless of biological sex.[108]

---

[105] J.App.003-004, R. Doc. 1 at 3-4, Compl. ¶¶ 14-17 (Aaron); J.App.079, R. Doc. 15 at 3, Am. Compl. ¶ 12 (Joseph).

[106] J.App.003-005, R. Doc. 1 at 3-5 (Aaron); J.App.079-081, R. Doc. 15 at 3-5 (Joseph) (bold added)

[107] *Id*.

[108] *Id.* (bold added).

Appellate Case: 23-1207    Page: 53    Date Filed: 03/28/2023 Entry ID: 5259091

By pleading that the DHS training required them to "admit," "confess," and to "accept" certain doctrines to which each sincerely objected on religious grounds, the Norgrens have sufficiently alleged that DHS was also compelling their speech. *Id.* The district court failed to acknowledge these allegations, which is reversible error.

The district court also held that "[t]here are no allegations that the Norgrens were told each would be subject to discipline unless he made or refrained from making certain statements, or that each was compelled to affirmatively make statements in front of a supervisor or submit an affidavit attesting to the statements."[109] This, too, fails to acknowledge the Norgrens' allegations, or at best takes all inferences *against* them, instead of for them.

Taken as a whole, in a light most favorable to the Norgrens, the Complaint and Amended Complaint alleged that each Appellant expected he would be fired if: (1) he did not undergo the required trainings; and (2) he did not "admit the truth" of the trainings' content and follow their explicit directives.[110] The pleadings show that the Norgrens would have lost their jobs—or they reasonably believed they would—if

---

[109] J.App.041, R. Doc. 22 at 12, Order 12 (Aaron), J.App.112, R. Doc. 38 at 14, Order 14 (Joseph).

[110] J.App.006, 013-014, R. Doc. 1 at 6, 13-14, Compl. ¶¶ 27 (required to complete the training), 81a (threat by Pherson), 81b (exemption denied) (Aaron); J.App.089-090, R. Doc. 15 at 13-14, Am. Compl. ¶¶ 69 (threat by Pherson), 71 (exemption denied), 74 ("Plaintiff . . . felt he had no [choice] but to comply as a condition of his employment.") (Joseph).

Appellate Case: 23-1207     Page: 54     Date Filed: 03/28/2023 Entry ID: 5259091

they did not submit to the trainings. A training described as "required" signifies that it is required for one's job, to keep one's job. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) (stating that "the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech.").[111] The Norgrens easily alleged compulsion by Commissioner Harpstead.

Harpstead's policy has, under threat of termination, compelled the Norgrens' silence, assent, affirmation, or application of the substance of the trainings. This goes well beyond the scope of legitimate on-the-job training. The Norgrens have alleged that the acceptance and affirmation of the truthfulness of the trainings' contents is a prerequisite for promotion, respect, and dignity in the workplace. Harpstead has compelled their compliance.

**C. Harpstead does not enjoy qualified immunity for her actions.**

The district court held that Commissioner Harpstead was entitled to qualified immunity because the Norgrens did not identify "any controlling cases with similar facts that would have put Commissioner Harpstead on notice that she was violating

---

[111] To be sure, a state employer can mandate training for its employees. *See Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 (8th Cir. 2001) ("a public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate. An employee who refuses to be trained has, from the employer's reasonable perspective, impeded his or her ability to do the job."). But this does not give DHS a license to instruct employees, through a training, to say or not say what DHS believes they ought to say or not say on matters of public concern, and especially not against their personal and religious convictions.

47

their First Amendment rights, even though she is not alleged to have had any personal interaction with them," and so "Harpstead did not violate a right that was clearly established at the time of the alleged conduct . . . ."[112]

Again, this Court's *Jackson v. Nixon* decision (along with the other precedent cited above related to Commissioner Harpstead's involvement) refutes the district court's analysis. *Jackson* is black-letter circuit precedent holding that "personal interaction" is decidedly *not* required for liability to attach to a commissioner with authority to mandate trainings such as the CRT and Gender Identity Trainings. *See, supra*, Section IV.A.

The law is also crystal-clear that government compelling speech runs afoul of the First Amendment, and the DHS policy itself advocated for changing minds and speech, so the policy is facially unconstitutional when compared to even the most general Supreme Court holding on compelled speech. *See Janus*, 138 S. Ct. at 2463 ("Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned."); *Telescope Media Grp.*, 936 F.3d at 752 (quoting *Boy Scouts of Am.*, 530 U.S. at 654) ("After all, the 'choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's

---

[112] J.App.044, R. Doc. 22 at 15, Order 15 (Aaron); J.App.114, R. Doc. 38 at 16, Order 16 (Joseph).

Appellate Case: 23-1207    Page: 56    Date Filed: 03/28/2023 Entry ID: 5259091

power to control.'"); *Rumsfeld v. FAIR* , 547 U.S. 47, 61 (2006) ("Some of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say."); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

Harpstead intended the trainings to change minds, and the trainings themselves dictated how employees were to speak and think about these important subjects. She knew or should have known that she was, as a matter of law, compelling the speech of employees, and as such could be liable for any constitutional violations caused by those actions. The district court erred by dismissing the Norgrens' First Amendment compelled speech claims against Commissioner Harpstead. This Court should reverse and remand for discovery and further proceedings.

## CONCLUSION

The Norgrens have a right to work for a state employer while remaining true to their religious beliefs. They cannot be forced to repeat racist propaganda and use pronouns inconsistent with another employee's biological sex based on DHS and Harpstead's preference for those thoughts and behaviors. Yet the district court's decision would allow DHS and Commissioner Harpstead to do just that. The

Appellate Case: 23-1207    Page: 57    Date Filed: 03/28/2023 Entry ID: 5259091

Norgrens respectfully request that this Court reverse the district court's decision and remand for discovery and other further proceedings.

Respectfully submitted,

**UPPER MIDWEST LAW CENTER**

Dated: March 27, 2023        */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,802 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in Times New Roman font, 14-point.

3.  The brief and addendum have been scanned for viruses and are virus free.

**UPPER MIDWEST LAW CENTER**

Dated: March 27, 2023

*/s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

51

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service has been accomplished by the CM/ECF system.

**UPPER MIDWEST LAW CENTER**

Dated: March 27, 2023                     */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

52