Nos. 23-1207 and 23-1208

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

Aaron Norgren,

Plaintiff-Appellant,

vs.

Minnesota Department of Human Services, et al.,

Defendants-Appellees.

Joseph Norgren,

Plaintiff-Appellant,

vs.

Minnesota Department of Human Services, et al.,

Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
(NO. 0:22-CV-02009 (ADM/JFD); NO. 0:22-CV-00489 (ADM/TNL))

BRIEF OF APPELLEES

KEITH ELLISON
Attorney General
State of Minnesota

NICK PLADSON (#0388148)
Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 300-7083 (Voice)
Nick.Pladson@ag.state.mn.us

ATTORNEY FOR APPELLEES

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

Despite the Norgrens' perception, this case is not a showdown between workplace diversity training and their rights under the First Amendment or Title VII. Instead, this case presents the unremarkable and answered question of whether a public employer can require public employees to attend workplace trainings. This Court has specifically held that they can. Joseph and Aaron Norgren, father and son, have much in common including their faith and their chosen professions. The Norgrens also objected to two specific workplace diversity training videos. After seeking an exemption, Joseph Norgren retired from DHS on a date he chose, was allowed to exhaust seven weeks of paid vacation beforehand, and finished a 27-year career on his own terms. Joseph made this decision before DHS denied the Norgrens' exemption requests. Aaron Norgren was encouraged to pursue supervisory opportunities. Although Aaron was subsequently not promoted to a position he was not qualified to hold, he continues his nearly 10-year DHS career to this day.

The district court correctly dismissed the Norgrens' complaints for failure to state a claim, and this Court should affirm those decisions in all respects.

If the Court grants oral argument, Appellees agree with Appellants' request for 15 minutes per side.

i

# TABLE OF CONTENTS

Page

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF THE CASE................................................................2

I.  FACTUAL BACKGROUND.................................................................2

    A.  Joseph Norgren Never Objected to the Anti-Racism Training and Retired Before DHS Denied His Exemption From Gender Identity Training.........................................................5

    B.  Aaron Norgren Refused To Watch the Anti-Racism And Gender Identity Training Videos in September 2020, His Request for An Exemption Was Denied, But He Was Never Disciplined..................10

    C.  Aaron Pursued Supervisory Opportunities, But Was Not Qualified For a Permanent Position in July 2021. .............................11

    D.  Procedural History.................................................................14

        1.  Joseph's Lawsuit against DHS and Commissioner Harpstead ........................................................................14

        2.  Aaron's Lawsuit against DHS and Commissioner Harpstead ........................................................................15

        3.  Consolidation for Purposes of Oral Argument .........................15

SUMMARY OF ARGUMENT ...............................................................16

I.  THE DISTRICT COURT PROPERLY DISMISSED ALL OF THE NORGRENS' CLAIMS .................................................................................17

Appellate Case: 23-1207    Page: 3    Date Filed: 04/27/2023 Entry ID: 5270019

ARGUMENT ..................................................................................................19

I.   THE NORGRENS FAIL TO STATE § 1983 CLAIMS AGAINST
     COMMISSIONER HARPSTEAD...................................................................19

     A.   The Norgrens Fail To Allege That Commissioner Harpstead
          Personally Engaged In Purposefully Unconstitutional Conduct.........19

     B.   The Norgrens Fail to State Plausible First Amendment
          Retaliation Claims. ...................................................................22

          1.   Joseph Fails to State a Plausible First Amendment
               Retaliation Claim. .......................................................23

          2.   Aaron Fails to State a Plausible First Amendment
               Retaliation Claim. .......................................................25

     C.   The Norgrens Fail to State Plausible First Amendment
          Compelled Speech Claims. .......................................................26

     D.   Commissioner Harpstead is Entitled to Qualified Immunity..............29

II.  AARON FAILS TO STATE A PLAUSIBLE TITLE VII RETALIATION CLAIM..........32

     A.   The Timing of Aaron's Rejection Was Merely Coincidental
          Because He Was Not Qualified For the Permanent Supervisor
          Position. ..................................................................................33

     B.   Aaron Fails to Plead that DHS Decisionmakers Knew of His
          EEOC Charge. ..........................................................................38

     C.   Aaron Fails to Plead That DHS Filled the Position or that it was
          Filled with a Similarly Situated Person Outside his Protected
          Class. ......................................................................................39

III. THE NORGRENS FAILED TO PLEAD PLAUSIBLE RELIGIOUS
     DISCRIMINATION CLAIMS. ....................................................................40

     A.   Joseph Fails to State a Plausible Claim of Religious Disparate
          Treatment.................................................................................40

          1.   Joseph Fails to State a Plausible Constructive Discharge
               Claim. ........................................................................41

Appellate Case: 23-1207   Page: 4   Date Filed: 04/27/2023 Entry ID: 5270019

    2.    Joseph Fails to Plead Facts Plausibly Permitting an Inference of Discrimination. ...................................................46

  B.    Aaron Fails to State a Plausible Claim of Religious Disparate Treatment...........................................................................46

CONCLUSION ........................................................................................49

Appellate Case: 23-1207    Page: 5    Date Filed: 04/27/2023 Entry ID: 5270019

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Altman v. Minn. Dep't of Corr.*,
   251 F.3d 1199 (8th Cir. 2001) ............................................................. 1, 30, 44, 45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................... Passim

*Baribeau v. City of Minneapolis*,
   596 F.3d 465 (8th Cir. 2010) .................................................................... 22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................... 17, 18

*Blake v. M.J. Optical, Inc.*,
   870 F.3d 820 (8th Cir. 2017) .................................................................... 41

*Blomker v. Jewell*,
   831 F.3d 1051 (8th Cir. 2016) ........................................................ 1, 18, 34, 45

*Bostock v. Clayton Cnty., Georgia*,
   140 S. Ct. 1731 (2020) .............................................................................. 2

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) .................................................................... 34

*Brennan v. Deluxe Corp.*,
   361 F. Supp. 3d 494 (D. Md. 2019) ......................................................... 44

*Buonanno v. AT&T Broadband, LLC*,
   313 F. Supp. 2d 1069 (D. Colo. 2004) ..................................................... 44

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ............................................................................. 31, 32

v

**Federal Cases (cont.)**

*Bus. Leaders In Christ v. Univ. of Iowa*,
  991 F.3d 969 (8th Cir. 2021)......................................................... 29

*Carpenter v. Con-Way Cent. Express, Inc.*,
  481 F.3d 611 (8th Cir. 2007)......................................................... 41

*Connick v. Myers*,
  461 U.S. 138 (1983) .............................................................. 23, 24

*Cressman v. Thompson*,
  798 F.3d 938 (10th Cir. 2015)....................................................... 26

*D.C. v. Wesby*,
  138 S. Ct. 577 (2018) ................................................................ 31

*Devine v. Pittsburgh Bd. of Pub. Educ.*,
  No. 2:13-cv-220,
  2015 WL 3646453 (W.D. Pa. June 10, 2015)...................................... 44, 45

*Ellis v. Houston*,
  742 F.3d 307 (8th Cir. 2014)..................................................... 1, 20, 21

*Fullington v. Pfizer, Inc.*,
  720 F.3d 739 (8th Cir. 2013)......................................................... 39

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) .............................................................. 1, 22, 25

*Gibson v. Am. Greetings Corp.*,
  670 F.3d 844 (8th Cir. 2012)......................................................... 32

*Gregory v. Dillard's, Inc.*,
  565 F.3d 464 (8th Cir. 2009)......................................................... 18

*Hager v. Arkansas Dep't of Health*,
  735 F.3d 1009 (8th Cir. 2013)...................................................Passim

Appellate Case: 23-1207     Page: 7     Date Filed: 04/27/2023 Entry ID: 5270019

## Federal Cases (cont.)

*Horton v. Midwest Geriatric Mgmt., LLC,*
   963 F.3d 844 (8th Cir. 2020)............................................................ 2

*In re Kemp,*
   894 F.3d 900 (8th Cir. 2018)............................................................ 22

*In re SuperValu, Inc.,*
   925 F.3d 955 (8th Cir. 2019)............................................................ 18

*Int'l Bhd. of Teamsters v. United States,*
   431 U.S. 324...................................................................................... 48

*Jackson v. Ark. Dep't of Educ.,*
   272 F.3d 1020 (8th Cir. 2001)........................................................ 43

*Jackson v. Nixon,*
   747 F.3d 537 (8th Cir. 2014)....................................................... 20, 21

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
   138 S.Ct. 2448 (2018) .................................................................. 26, 31

*Jenkins v. Winter,*
   540 F.3d 742 (8th Cir. 2008)........................................................... 16

*Kelly v. City of Omaha, Neb.,*
   813 F.3d 1070 (8th Cir. 2016)......................................................... 17

*Kipp v. Missouri Highway & Transp. Comm'n,*
   280 F.3d 893 (8th Cir. 2002)........................................................... 33

*Kratzer v. Rockwell Collins, Inc.,*
   398 F.3d 1040 (8th Cir. 2005)......................................................... 34

*L.L. Nelson Enters., Inc. v. County of St. Louis,*
   673 F.3d 799 (8th Cir. 2012)........................................................... 21

*LaCross v. City of Duluth,*
   713 F.3d 1155 (8th Cir. 2013)......................................................... 29

Appellate Case: 23-1207     Page: 8     Date Filed: 04/27/2023 Entry ID: 5270019

**Federal Cases (cont.)**

*Lee v. Weisman*,
  505 U.S. 577 .......................................................................................... 20

*McAuley v. Fed. Ins. Co.*,
  500 F.3d 784 (8th Cir. 2007) ................................................................. 2

*McPherson v. Brennan*,
  888 F.3d 1002 (8th Cir. 2018) ........................................................ 1, 36

*Morgan v. Robinson*,
  920 F.3d 521 (8th Cir. 2019) ................................................................ 29

*Naca v. Macalester Coll.*,
  947 F.3d 500 (8th Cir. 2020) ................................................................ 11

*Nelson v. USAble Mut. Ins. Co.*,
  918 F.3d 990 (8th Cir. 2019) .......................................................... 1, 34

*Pennsylvania State Police v. Suders*,
  542 U.S. 129 (2004) ....................................................................... 1, 41

*Porter v. City of Lake Lotawana*,
  651 F.3d 894 (8th Cir. 2011) ................................................................ 38

*Revels v. Vincenz*,
  382 F.3d 870 (8th Cir. 2004) ........................................................ 21, 22

*Robinson v. Potter*,
  453 F.3d 990 (8th Cir. 2006) ................................................................ 38

*Rowe v. Hussmann Corp.*,
  381 F.3d 775 (8th Cir. 2004) ................................................................ 42

*Rowles v. Curators of Univ. of Missouri*,
  983 F.3d 345 (8th Cir. 2020) ................................................................ 42

*Schottel v. Nebraska State Coll. Sys.*,
  42 F.4th 976 (8th Cir. 2022) .......................................................... 1, 38

Appellate Case: 23-1207    Page: 9    Date Filed: 04/27/2023 Entry ID: 5270019

**Federal Cases (cont.)**

*Shirrell v. St. Francis Med. Ctr.*,
   793 F.3d 881 (8th Cir. 2015)................................................................. 40

*Telescope Media Group v. Lucero*,
   936 F.3d 740 (8th Cir. 2019)................................................................. 31

*Texas Dep't of Cmty. Affs. v. Burdine*,
   450 U.S. 248 (1981)................................................................. 47, 48

*Univ. of Tx. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013)................................................................. 32

*Wagner v. Jones*,
   664 F.3d 259 (8th Cir. 2011)................................................................. 47

*Warmington v. Bd. of Regents of Univ. of Minn.*,
   998 F.3d 789 (8th Cir. 2021)................................................................. Passim

*White v. Pauly*,
   580 U.S. 73 (2017)................................................................. 29, 30, 31

*Williamson v. A.G. Edwards & Sons, Inc.*,
   876 F.2d 69 (8th Cir. 1989)................................................................. 2

*Wilson v. Arkansas Dep't of Hum. Servs.*,
   850 F.3d 368 (8th Cir. 2017)................................................................. 1, 32, 33

**Federal Statutes**

42 U.S.C. § 1983................................................................. passim

42 U.S.C. § 2000e-2(a)(1), 2000e-3................................................................. 30, 40

42 U.S.C. § 2000e-5(e)(1)................................................................. 42

48 U.S.C. § 2000e–3(a)................................................................. 32

42 U.S.C. §§ 2000b to 2000b-3................................................................. 30

Appellate Case: 23-1207   Page: 10   Date Filed: 04/27/2023 Entry ID: 5270019

**State Statutes**

775 Ill. Comp. Stat. Ann. 5/2-105(B)(5) (2023) ........................................ 45

Fla. Stat. Ann. § 110.112 (West 2016) ..................................................... 45

Minn. Stat. § 13.43, subd. 3 (2022) ......................................................... 37

Minn. Stat. § 363A.08 ............................................................................. 30

Minn. Stat. § 363A.12 ............................................................................. 30

Tenn. Code Ann. § 4-3-1703 .................................................................... 45

Tex. Labor Code Ann. § 21.010 (West 2021) ........................................... 45

**Federal Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................... 15

Fed. R. Civ. P. 12(b)(6) ........................................................................... 15

**State Regulations**

Nev. Admin. Code 284.496 (2022) ........................................................... 45

Utah Admin. Code R477-10-4 (2022) ....................................................... 45

# STATEMENT OF ISSUES

1. Whether the Norgrens' Section 1983 claims were properly dismissed for failure to state a claim or because Commissioner Harpstead was entitled to qualified immunity.

   Apposite Authorities:

   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)
   *Garcetti v. Ceballos,* 547 U.S. 410 (2006)
   *Ellis v. Houston,* 742 F.3d 307 (8th Cir. 2014)
   *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001)

2. Whether Aaron Norgren failed to state a plausible retaliatory failure to promote claim under Title VII.

   Apposite Authorities:

   *Schottel v. Nebraska State Coll. Sys.,* 42 F.4th 976 (8th Cir. 2022)
   *Nelson v. USAble Mut. Ins. Co.*, 918 F.3d 990 (8th Cir. 2019)
   *McPherson v. Brennan*, 888 F.3d 1002 (8th Cir. 2018)
   *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368 (8th Cir. 2017)

3. Whether the Norgrens failed to state plausible religious discrimination claims under Title VII.

   Apposite Authorities:

   *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004)
   *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789 (8th Cir. 2021)
   *Blomker v. Jewell*, 831 F.3d 1051 (8th Cir. 2016)
   *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009 (8th Cir. 2013)

1

## I. FACTUAL BACKGROUND.[2]

On May 25, 2020, George Floyd was murdered by Minneapolis Police officers. Contemporaneous video footage of Floyd's murder went viral, prompting local, national, and international outrage and introspection.

On June 15, 2020, the United States Supreme Court held for the first time that Title VII of the Civil Rights Act prohibits employment discrimination on the bases of sexual orientation and gender identity, overruling longstanding, contrary precedent in courts across the country, including the Eighth Circuit.[3]

In August 2020, to address workplace issues that arose from these historical events, the Minnesota Department of Human Services (DHS) added two training videos to its cache of annual employee trainings: (1) a 30-minute video titled "How

---

[1] To clarify record references, citations to the record for Joseph Norgren's complaint, (No. 0:22-CV-00489 (D. Minn.)/Eighth Cir. Case No. 23-1208), will be appended with "(Joseph)". Citations to the record for Aaron Norgren's complaint, (No. 0:22-cv-02009 (D. Minn.)/Eighth Cir. Case No. 23-1207), will be appended with "(Aaron)".

[2] Appellees take the allegations in the Norgrens' complaints as true at this stage in the proceedings. *See, e.g.*, *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007). This presumption does not extend to conclusory allegations or any "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] *See Horton v. Midwest Geriatric Mgmt., LLC*, 963 F.3d 844, 847 (8th Cir. 2020) (acknowledging that *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020) overruled longstanding circuit precedent *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69 (8th Cir. 1989)).

Appellate Case: 23-1207    Page: 13    Date Filed: 04/27/2023 Entry ID: 5270019

to be Anti-Racist" (HR 670.1), and (2) a 40-minute video titled "Understanding Gender Identity and Expression: Moving Beyond the Binary" (HR 670.20).[4]

In an all-staff email, DHS Commissioner Jodi Harpstead announced DHS's annual workplace trainings, asking employees to focus on "the training and brave conversations we need to have to change minds … for life."[5] DHS Assistant Commissioner Karen McKinney[6] also told employees "We need all of you to do this."[7] Nearly all DHS employees have watched the two videos without complaint.

All DHS employees working in the Forensic Mental Health Services program[8] at the Minnesota Security Hospital, including Security Counselors Joseph and Aaron

---

[4] App. 3-4; R. Doc. 1, at 3-4, ¶¶ 14, 17 (Aaron). App. 79-80; R. Doc. 15, at 3-4, ¶¶ 13, 16 (Joseph).

[5] App. 83, 89; R. Doc. 15, at 7, 13, ¶¶ 30, 70 (Joseph). App. 7, 14; R. Doc. 1 at 7, 14, ¶¶ 33, 82 (Aaron).

[6] DHS Assistant Commissioner Karen McKinney is not a defendant in either of the cases before this Court.

[7] App. 79; R. Doc. 15, at 3, ¶ 15 (Joseph). App. 3-4; R. Doc. 1, at 3-4, ¶ 16 (Aaron).

[8] The Forensic Mental Health Services program provides mental health evaluation and specialized treatment services statewide to individuals in the legal system due to a crime through its Forensic Network, treatment programs, and support services. *See* DHS's webpage titled *Forensic Services*, which is publicly available at: https://mn.gov/dhs/people-we-serve/adults/services/direct-care-treatment/programs-services/#6 (last viewed April 25, 2023). The programs serve people committed as mentally ill and dangerous or other commitment types who present a public safety risk. Forensic Services also serves people with mental illness who the court has ordered for evaluation and treatment before the start of a criminal trial.

Appellate Case: 23-1207    Page: 14    Date Filed: 04/27/2023 Entry ID: 5270019

Norgren,[9] were told to watch the training videos.[10] To complete the trainings, DHS expected employees to:

> Watch all of the videos completely through until the end – including the part with a full minute of silence. When you've finished watching the two main videos (one is 30 minutes and the other 40 minutes), you should close out by clicking the "Exit" button on the bottom of the window. When you do that, it may pop up a small window/prompt in the background to successfully close out of the course. . . .[11]

That was it; watch the video and close the viewing window when complete.[12] There was no post-video quiz; no post-video certification for employees to affirm, agree, or commit to believing the content of the videos; and no command that employees repeat the words or content from the videos (or abstain from commenting on the content of the video).[13] There was also no statement or threat that any DHS employee would be disciplined if they refused to watch the two videos.[14]

---

[9] Like Appellants' brief, Appellees' brief will refer to Joseph Norgren as "Joseph," Aaron Norgren as "Aaron," or jointly as the "Norgrens," to avoid confusion. *See* Appellants Brief, 3, n.1 ("App. Br.").

[10] App. 3-4; R. Doc. 1, at 3-4, ¶¶ 13, 18 (Aaron). App. 79-80; R. Doc. 15, at 3-4, ¶¶ 13, 17 (Joseph). App. 73-74; R. Doc.12-1, at Ex. A.

[11] App. 73-74; R. Doc. 12-1, at Ex. A.

[12] *Id.*

[13] *Id.*

[14] *Id.*

Appellate Case: 23-1207   Page: 15   Date Filed: 04/27/2023 Entry ID: 5270019

## A. Joseph Norgren Never Objected to the Anti-Racism Training and Retired Before DHS Denied His Exemption From Gender Identity Training.

On September 10, 2020, Joseph's supervisor sent an email to Joseph and his 31 colleagues telling them that, in addition to other training videos, they were required to watch the new videos on anti-racism and gender identity.[15]

Joseph alleges he opposed watching the gender identity video because he is a Christian and the concept of nonbinary gender is "contrary to his sincerely held religious belief."[16] Joseph told his supervisor he objected to watching it and asked for a religious exemption.[17] Joseph's request for a religious exemption was forwarded to DHS's Equal Opportunity and Access Division ("EOAD") Director for consideration.[18]

Until September 2020, when DHS asked him to watch the gender identity awareness video, Joseph only felt discriminated against for his beliefs one other time during his 27-year career.[19] In October 2018, while conducting rounds on the night shift, Joseph alleges he encountered a night-shift supervisor talking politics with

---

[15] App. 79-80; R. Doc. 15, at 3-4, ¶¶ 12, 15 (Joseph). App. 73-4; R. Doc. 12-1, at 1-2.

[16] App. 78, 81; R. Doc. 15, at 2, 5, ¶¶ 7, 21 (Joseph). Joseph alleges he opposed watching the anti-racism video, but never asked to be excused from watching it and did not notify anyone at DHS he objected to its content before watching it. App. 80-81; R. Doc. 15, at 4-5, ¶¶ 18-20 (Joseph).

[17] App. 81-82; R. Doc. 15, at 5-6, ¶¶ 20, 23-25 (Joseph).

[18] *Id.*

[19] App. 79, 82-83; R. Doc. 15, at 3, 6, ¶¶ 10, 27-28 (Joseph).

5

another employee.[20] Joseph joined the conversation, which included "the topics of *Roe v. Wade*, the U.S. Constitution, and gender identity."[21] At one point, the supervisor asked Joseph "how many genders existed."[22] Joseph alleges he felt obligated to respond to a supervisor and said "he believed only two genders and two sexes existed, based on everything he read and researched on DNA and biology."[23] As they continued talking, the supervisor allegedly told Joseph he "could be fired for the way he thought and spoke."[24] Joseph does not allege that he ever mentioned his religious beliefs in that conversation, and does not allege that the night-shift supervisor or anyone else at DHS was aware of them until September 2020.[25] In fact, Joseph does not allege that he ever informed anyone at DHS about his 2018 conversation with the supervisor.[26]

After the October 2018 conversation, Joseph allegedly noticed a "difference" in how he and his son Aaron – also a Security Counselor with DHS – were treated.[27] But as Joseph's counsel conceded, Joseph does not allege any discriminatory

---

[20] App. 82; R. Doc. 15, at 6, ¶ 27 (Joseph).

[21] *Id*. (emphasis in original).

[22] App. 82-83; R. Doc. 15, at 6-7, ¶ 28 (Joseph).

[23] *Id*.

[24] *Id*.

[25] Joseph specifically told Supervisor Pherson that his beliefs about gender identity were based on "DNA and biology," but makes no mention of his religious beliefs.

[26] There is no allegation that DHS was aware of this incident until February 2022, when Joseph filed this lawsuit.

[27] App. 83; R. Doc. 15, at 7, ¶ 29 (Joseph).

6

conduct between the October 2018 conversation with the supervisor and DHS's September 2020 requirement that he and all his co-workers watch the gender identity awareness video.[28]

On October 6, 2020, with his request for a religious exemption still pending with EOAD, Joseph announced his retirement:

> **From:** Norgren, Joseph N (DHS) <joe.norgren@state.mn.us>
> **Sent:** Tuesday, October 06, 2020 1:57 PM
> **To:** Ploog, Paul H (DHS) <paul.ploog@state.mn.us>
> **Cc:** Kuhlman, Allison A (DHS) <allison.kuhlman@state.mn.us>
> **Subject:** Correctional Retirement date
>
> Hello Paul, Per our discussion on 10-6-2020, I am sending this email to inform you of my retirement date. I have and will use, pre-approved vacation beginning November 16, 2020 through and including January 5, 2021. I will not return to work on January 6, 2021 as that will be my requested official retirement date. Please forward this to those responsible for assisting me with the retirement process. I have already contacted Betsy Dalluge of MSRS and discussed retirement with her. Thank you for your help.[29]

DHS staff congratulated Joseph on his retirement, referred him to two retirement specialists, and encouraged him to reach out if he needed further assistance.[30]

On October 27, 2020, three weeks after Joseph's retirement announcement, the DHS EOAD Director informed Joseph that his request for a religious exemption

---

[28] *Id.*; R. Doc. 47, at 24-25 (Joseph).
[29] App. 75-76; R. Doc. 12-2, at Ex. B (Joseph).
[30] *Id.*

7

from watching the gender identity awareness training video was denied.[31] On October 30, with only 16 potential working days left in his career, Joseph told the EOAD Director that denying his request to not watch the gender identity awareness video "subjects me to harassment," asked how to appeal the decision, and requested a copy of the training for his records.[32] The EOAD Director provided Joseph with a hard copy of the gender identity awareness training and explained that there was no right to appeal DHS's decision.[33] DHS's determination did not make Joseph re-think his retirement decision; as he says, it "solidified and confirmed my contemplation of not continuing my 27-year service with the State of Minnesota."[34] Joseph does not allege that he was ever actually forced to watch the gender identity awareness video and does not allege that he was disciplined for refusing to do so.

Nevertheless, Joseph vaguely alleges that his fear of being terminated for his beliefs was "aggravated" by DHS subjecting him to "months of reviewing weekly communications" related to anti-racism trainings that "contradicted principles of

---

[31] App. 82; R. Doc. 15, at 6, ¶ 24 (Joseph). The Norgrens cast the denial of Joseph's request as a "one sentence refusal to accommodate." App. Br, 36. But this is misleading. The one sentence email explicitly referred to a thoughtful, multi-page response attached to the email: "*Attached* please find a determination given on your request for a religious accommodation from taking Training HR670.2." App. 95; R. Doc. 15-1, Ex. A, p.2 (Joseph).

[32] App. 95; R. Doc. 15-1, Ex. A, p.2 (Joseph).

[33] App. 94; R. Doc. 15-1, Ex. A, p.1 (Joseph).

[34] *Id.*

Appellate Case: 23-1207    Page: 19    Date Filed: 04/27/2023 Entry ID: 5270019

equality under the Constitution and Title VII."[35] Joseph singles out one message from Commissioner Harpstead urging all DHS employees to "focus on the training and brave conversations we need to have to change . . . minds for life."[36] Joseph alleges that he was so cowed by the October 2018 comment from a single night-shift supervisor that he "avoided his supervisors" out of fear he'd be terminated for his beliefs,[37] but he also alleges he "voiced his dissent against such indoctrination of contradictory views and theories to DHS supervisors."[38] Consistent with his October 6, 2020 email, Joseph's last work shift was on or before November 15, 2020 and he retired from DHS effective January 6, 2021.[39]

On June 26, 2021, Joseph filed a discrimination charge with the Equal Opportunity Commission (EEOC), alleging discrimination, retaliation, and constructive discharge.[40] On January 3, 2022, before the EEOC investigation was complete and at Joseph's request, the EEOC issued him a notice of right to sue.[41]

---

[35] App. 83; R. Doc. 15, at 7, ¶ 31 (Joseph).
[36] App. 89; R. Doc. 15, at 13, ¶ 70 (Joseph).
[37] App. 83; R. Doc. 15, at 7, ¶ 29 (Joseph)
[38] App. 83; R. Doc. 15, at 7, ¶ 31 (Joseph).
[39] App. 84; R. Doc. 15, at 8, ¶ 33(Joseph). App. 75-76; R. Doc. 12-2.
[40] App. 84; R. Doc. 15, at 8, ¶ 37 (Joseph).
[41] App. 84, 96; R. Doc. 15, at 8, ¶ 40, Ex. B (Joseph).

Appellate Case: 23-1207   Page: 20   Date Filed: 04/27/2023 Entry ID: 5270019

## B. Aaron Norgren Refused To Watch the Anti-Racism And Gender Identity Training Videos in September 2020, His Request for An Exemption Was Denied, But He Was Never Disciplined.

Joseph's son Aaron is employed by DHS as a Forensic Support Specialist (i.e., security counselor)[42] with DHS's Forensic Mental Health Program in St. Peter, MN.[43] In August 2020, a DHS supervisor emailed Aaron directing him to watch several training videos, including the new anti-racism and gender identity videos.[44]

Aaron notified his supervisors that he opposed watching both videos.[45] Aaron's request was referred to the EOAD Director, who denied the request.[46] Although his request was denied, Aaron does not allege he ever watched either training video or that he was disciplined for refusing to do so.

In allegations cut-and-pasted from Joseph's lawsuit, Aaron further alleges that his circumstances were "aggravated by [Commissioner] Jodi Harpstead's direction and communication that included the urging of a 'focus on training' to change 'minds for life.'"[47] Like his father, Aaron vaguely alleges he "endured months of

---

[42] Joseph's Amended Complaint identifies his position (Security Counselor) and the program where he worked (State Security Hospital) differently, but Aaron's position (Forensic Support Specialist) and the program where he worked (Forensic Mental Health Program) are the same, they simply use different names.

[43] App. 78-79; R. Doc. 15, at 2-3, ¶¶ 9-11 (Joseph). App. 2; R. Doc. 1, at 2, ¶¶ 8-10 (Aaron).

[44] App. 4; R. Doc. 1, at 4, ¶ 18 (Aaron).

[45] App. 6; R. Doc. 1, at 6, ¶ 22 (Aaron).

[46] App. 6; R. Doc. 1, at 6, ¶¶ 25-26 (Aaron).

[47] App. 7; R. Doc. 1, at 7, ¶¶ 33-34 (Aaron).

10

reviewing weekly communications and videos sent by DHS that contradicted the principles of equality under the constitution and Title VII."[48]

Months after Aaron objected to the watching the training videos, supervisors refused to grant him an excused absence when he tried "to call in for bad weather."[49] After he objected, DHS reversed its decision and excused Aaron's absence.[50]

## C. Aaron Pursued Supervisory Opportunities, But Was Not Qualified For a Permanent Position in July 2021.

In February 2021, Aaron applied for a temporary Group Supervisor Assistant, Administrative On Duty Supervisor ("Temporary Supervisor Position").[51] DHS Administrative Operations Director Ted Wondra invited Aaron to interview for the position, but Aaron could not attend due to scheduling conflicts.[52] Director Wondra still encouraged Aaron, telling him that DHS was posting for a permanent position

---

[48] *Id.*

[49] App. 7-8; R. Doc. 1, at 7-8, ¶ 35 (Aaron).

[50] App. 8; R. Doc. 1, at 8, ¶ 36 (Aaron). For the first time on appeal, Aaron asserts that, in addition to being denied a promotion for filing an EEOC Charge, his retaliation claim is also based on allegations he was denied an excused absence due to weather several months after he "objected to and sought an exemption from DHS' CRT and Gender Identity Trainings . . . " App. Br., at 19-20. Aaron did not include these allegations in the description of his retaliation cause of action, (App. 13; R. Doc. 1, at 12 (Aaron)), his opposition to Defendants' Motion to Dismiss (R. Doc. 17, at 10-11 (Aaron)), and did not make this argument to the district court. *See generally*, R. Doc. 31 (Hearing Transcript). App. 38-40; R. Doc. 22, at 9-11 (Aaron). Accordingly, Aaron has waived this allegation because it was not raised before the district court, and this Court should not consider it. *Naca v. Macalester Coll.*, 947 F.3d 500, 501 (8th Cir. 2020).

[51] App. 8; R. Doc. 1, at 8, ¶ 38 (Aaron).

[52] App. 8, 19; R. Doc. 1, at 8, ¶ 39 Ex. A (Aaron). App. 25-26; R. Doc. 10-1, at 1-2.

"in the next couple of weeks, keep your eyes open for the post and I look forward to seeing your resume again."[53]

Four months later, on June 25, 2021, Aaron filed an EEOC charge, alleging DHS's refusal to immediately excuse his weather-related absence was discriminatory.[54]

On June 28, 2021, DHS posted a permanent Group Supervisor Assistant position ("Permanent Supervisor Position").[55] Aaron applied, submitting the *same* resume with the *same* qualifications he submitted for the Temporary Supervisor Position four months earlier.[56] However, the required experience for the Permanent Supervisor Position was different than the Temporary Supervisor Position.[57] The Temporary Supervisor posting sought applicants with certain work experience, but these were preferred qualifications, not required: "To qualify for this Work out of Class, applicants are *preferred* to have the following: . . ."[58]

In contrast, for the Permanent Supervisor Position, applicants were *required* to have: . . . [1] a minimum of one year supervisory experience in a secure environment . . . **OR** [2] a minimum of two years leadwork or paraprofessional

---

[53] App. 8, 19; R. Doc. 1, at 8, ¶ 40, Ex. A (Aaron).
[54] App. 8; R. Doc. 1, at 8, ¶ 37 (Aaron).
[55] App. 8; R. Doc. 1, at 8, ¶ 41 (Aaron). App. 27-29; R. Doc. 10-2, at Ex. B.
[56] App. 8; R. Doc. 1, at 8, ¶ 41 (Aaron).
[57] App. 25-29; R. Doc. 10-1, at Ex. A; R. Doc. 10-2, at Ex. B.
[58] App. 25-26; R. Doc. 10-1, at Ex. A, p. 1 (emphasis added).

12

experience in a secure environment . . . **OR** [3] an equivalent combination of the above."[59]

DHS allowed a relevant bachelor's degree or other supervisory experience to substitute for up to six months of otherwise required experience.[60] The credit worked like this:

> **A Bachelor's Degree in Criminal Justice, Law Enforcement, Rehabilitation Therapy, Health Sciences, Behavioral Sciences or a related field may be substituted for 6 months of experience at this level **OR** one year of supervisory experience may be substituted for a maximum of 6 months of experience at this level. (NOTE: Supervisory experience does not need to be within a secure environment).[61]

Aaron alleges that he qualified for the Permanent Supervisor Position because of this credit. Aaron has a bachelor's degree and nine years of supervisory experience in the military (not in a secure environment).[62] The Permanent Supervisor posting credited Aaron with up to six months experience for either his bachelor's degree, or his military supervisory experience, but not both.[63] Although Aaron qualified for the six-month experience credit, he lacked any other qualifying experience and failed to meet the minimum experience required for the Permanent Supervisor Position.

---

[59] App. 9; R. Doc. 1, at 9, ¶¶ 43-44 (Aaron). App. 27-29; R. Doc. 10-2, at Ex. B, p. 1. (emphasis in original).
[60] *Id.*
[61] App. 27-29; R. Doc. 10-2, at Ex. B (emphasis added).
[62] App. 9; R. Doc 1,at 9, ¶ 45 (Aaron).
[63] App. 9; R. Doc. 1, at 9, ¶ 45 (Aaron). App. 27-29; R. Doc. 10-2, at Ex. 2.

13

Accordingly, on July 16, 2021, DHS informed Aaron he did not qualify for the Permanent Supervisor Position.[64]

On November 8, 2021, Aaron amended his EEOC charge to include allegations regarding his rejection for the Permanent Supervisor Position.[65] On May 20, 2022, before the EEOC investigation was complete, and at Aaron's request, the EEOC issued him a notice of right to sue.[66]

### D.    Procedural History

#### 1.    Joseph's Lawsuit against DHS and Commissioner Harpstead

On February 25, 2022, Joseph filed his original six-claim complaint against DHS alleging discrimination on the basis of race, religion, and retaliation under Title VII, discrimination on the basis of race and religion under the Minnesota Human Rights Act (MHRA), and § 1983 claims against Commissioner Harpstead in her individual capacity for First Amendment retaliation and compelled speech.[67] On March 30, 2022, Defendants moved for dismissal.[68] In lieu of opposing Defendants' motion, on April 20, 2022, Joseph filed an Amended Complaint.[69] Defendants renewed their Motion to Dismiss.[70]

---

[64] App. 9; R. Doc. 1, at 9, ¶ 42 (Aaron).
[65] App. 9; R. Doc. 1, at 9, ¶ 49 (Aaron).
[66] App. 10, 21-22; R. Doc. 1, at 10, ¶ 50, Ex. B (Aaron).
[67] App. 49-64; R. Doc. 1, 1-16 (Joseph).
[68] R. Doc. 8.
[69] App. 77-93; R. Doc. 15, at 1-17 (Joseph).
[70] R. Doc. 19.

Appellate Case: 23-1207    Page: 25    Date Filed: 04/27/2023 Entry ID: 5270019

### 2. Aaron's Lawsuit against DHS and Commissioner Harpstead

On August 15, 2022, Aaron filed suit alleging seven causes of action against DHS and Commissioner Harpstead.[71] Aaron alleged that DHS discriminated against him because of his race, religion, and retaliation under Title VII, because of his race, religion, and reprisal under the MHRA, and a single count against Commissioner Harpstead under § 1983 for First Amendment reprisal and compelled speech. Defendants timely moved to dismiss Aaron's Complaint.

### 3. Consolidation for Purposes of Oral Argument

The District Court consolidated Joseph's and Aaron's complaints for purposes of oral argument. On January 4, 2023, the District Court dismissed their federal law claims with prejudice under Fed. R. Civ. P. 12(b)(6), and their state law claims without prejudice under Fed. R. Civ. P. 12(b)(1).[72]

These cases remain consolidated for purposes of this appeal. Joseph seeks reversal of the District Court's rulings on just two of his original six claims: (Count II) religious discrimination against DHS under Title VII, and (Count IV) First Amendment retaliation and compelled speech claims against Commissioner Harpstead in her individual capacity under Section 1983. Aaron seeks reversal of the District Court's rulings on just three of his original seven claims: (Count II) religious

---

[71] App. 1-18; R. Doc. 1, at 1-18 (Aaron).
[72] R. Doc. 38 (Joseph). R. Doc. 22 (Aaron).

Appellate Case: 23-1207     Page: 26     Date Filed: 04/27/2023 Entry ID: 5270019

discrimination against DHS under Title VII, (Count III) retaliation against DHS under Title VII, and (Count IV) First Amendment retaliation and compelled speech claims against Commissioner Harpstead in her individual capacity under Section 1983.[73]

## SUMMARY OF ARGUMENT

The district court's orders dismissing the Norgrens' complaints should be affirmed in all respects.

First, the Norgrens' Section 1983 claims were correctly dismissed because they failed to allege that Commissioner Harpstead personally engaged in any purposeful unconstitutional conduct, they otherwise failed to plead sufficient facts to state plausible First Amendment retaliation and compelled speech claims, and Commissioner Harpstead is entitled to qualified immunity.

Second, Aaron's Title VII retaliation claim was correctly dismissed because he has not pled fact demonstrating his qualifications for the promotion he sought, he does not allege that DHS decisionmakers were aware of his protected activity, and

---

[73] App. Br., 23. In the Norgrens' consolidated Statement of Issues, Aaron also sought review of the District Court's rulings dismissing his three MHRA claims without prejudice. App. Statement of Issues, Case No. 23-1207, at p.2 (Feb. 17, 2023) Entry ID: 5247260. Because Aaron omits any reference to those claims in his principal brief, he has waived them. *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) ("Claims not raised in an opening brief are deemed waived.").

Appellate Case: 23-1207     Page: 27     Date Filed: 04/27/2023 Entry ID: 5270019

he failed to plead facts suggesting that any similarly situated employees outside his protected class were treated more favorably.

Third, the Norgrens' Title VII religious discrimination claims were correctly dismissed because neither allege facts plausibly showing they were subject to adverse actions, treated differently than similarly situated employees, or offer any other facts plausibly suggesting an inference of discrimination. Joseph's claim failed to plead facts plausibly demonstrating an objectively intolerable work environment. And Aaron's claim fails because he does not allege that DHS was motivated by his religious beliefs, as opposed to his protected activity.

## I. THE DISTRICT COURT PROPERLY DISMISSED ALL OF THE NORGRENS' CLAIMS

This Court reviews *de novo* a district court's dismissal for failure to state a claim. *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1075 (8th Cir. 2016). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Warmington v. Bd. of Regents of Univ. of Minnesota*, 998 F.3d 789, 795 (8th Cir. 2021) (same). A claim is facially plausible where the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When ruling on a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint," but "this is inapplicable to legal conclusions." *Id*. at 678-79 (citing *Twombly*, 550 U.S. at 555-56). This Court will not assume the truth of allegations that are merely conclusory in nature, and will reject "catch-all assertions of law and unwarranted inferences." *In re SuperValu, Inc.*, 925 F.3d 955, 962 (8th Cir. 2019) (citing *Iqbal*, 556 U.S. at 681).While a plaintiff need not allege facts establishing a prima facie case for a Title VII claim, the elements of a prima facie case are still relevant part of the background against which a plausibility determination is made. *Warmington*, 998 F.3d at 796. Therefore, "*the complaint must include sufficient factual allegations to provide the grounds on which the claim rests.*" *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009)) (emphasis in original). Summarily alleging a plaintiff was treated differently than similarly situated members outside their protected class "imports legal language couched as a factual allegation and fails to raise a right to relief above a speculative level." *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013) (quoting *Twombly*, 550 U.S. at 555).

18

# ARGUMENT

## I. THE NORGRENS FAIL TO STATE § 1983 CLAIMS AGAINST COMMISSIONER HARPSTEAD.

The Norgrens both assert claims First Amendment retaliation and compelled speech claims against Commissioner Harpstead under 42 U.S.C. § 1983.[74] As the district court held, these claims fail because: (1) the Norgrens did not allege that Commissioner Harpstead personally committed a constitutional violation, and (2) the Norgrens did not allege facts to plausibly support the elements of a First Amendment retaliation or compelled speech claim, and (3) Commissioner Harpstead is entitled to qualified immunity.

### A. The Norgrens Fail To Allege That Commissioner Harpstead Personally Engaged In Purposefully Unconstitutional Conduct.

The Norgrens fail to allege that Commissioner Harpstead personally engaged in purposeful conduct that violated their constitutional rights. The Norgrens allegations only target conduct on the part of Commissioner Harpstead's agents, and say nothing about her intent.[75] The Norgrens attempt to avoid this precedent by re-casting their claims as improper supervision and training by Commissioner

---

[74] App. 88-90; R. Doc. 15 (Joseph). App. 13-14; R. Doc. 1 (Aaron).
[75] App. 83, 88-89; R. Doc. 15, at 7, 12-13, ¶¶ 31, 66, 69, 71 (Joseph). App. 9, 14; R. Doc. 1, at 9, 14, ¶¶ 81-84 (Aaron).

Harpstead.[76] But these are not the claims they pled; they only pled First Amendment retaliation and compelled speech claims.[77]

A government official can only be liable for a constitutional violation if they personally committed the violation. *See Iqbal*, 556 U.S. at 677 (explaining that each government official "is only liable for his or her own misconduct"). Section 1983 claims cannot be brought against government officials for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. *Ellis v. Houston*, 742 F.3d 307, 327 (8th Cir. 2014) (Loken, J., concurring, joined by Colloton, J.).

Nevertheless, relying heavily on this Court's decision in *Jackson v. Nixon*, the Norgrens propose holding Commissioner Harpstead personally liable for any alleged unconstitutional conduct they experienced because she leads the agency and has statutory authority to administer programs, including employee training. 747 F.3d 537 (8th Cir. 2014). But *Jackson* is inapposite. *Jackson* involved a Free Exercise claim under the Establishment Clause of the First Amendment, a claim that does not require pleading or proof of a government official's intent. *Id*. at 541 (citing *Lee v. Weisman*, 505 U.S. 577, 588-59 (recognizing that unconstitutional coercion may be exercised indirectly).) Thus, a prisoner could hold a state corrections director

---

[76] App. Br., at 40; *See also,* R. Doc. 17, at 18 (Aaron).
[77] App. 13-14; R. Doc. 1, at 13-14 (Aaron). App. 88-90; R. Doc. 15, at 12-14 (Joseph).

personally liable for a Section 1983 Free Exercise claim even though the director's participation was limited to program administration and there was no claim that they intended to coerce the prisoner, since they "knew or should have known" that the prison's programs could violate the Constitution. *Id*. at 544. Here, unlike *Jackson*, the Norgrens pursue First Amendment retaliation claims against Commissioner Harpstead fail because they did not plead that she personally committed unconstitutional conduct. *Iqbal*, 556 U.S. at 677.

Moreover, the Norgrens' claims against Commissioner Harpstead are also flawed because they fail to plead that she personally engaged in an adverse action "motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (noting that state employees pursuing Section 1981 and 1983 retaliation claims had to prove retaliatory motive). Where intent to discriminate is an element of a constitutional violation, a plaintiff must plead facts plausibly demonstrating that a supervisor acted with "the 'purpose' of engaging in unconstitutional discrimination." *Ellis,* 742 F.3d at 320 (citing *Iqbal*, 556 U.S. at 676); *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 804 (8th Cir. 2012) ("Where, as here, the alleged constitutional violation requires proof of an impermissible motive, the amended complaint must allege adequately that the defendant acted with such impermissible purpose, not merely that he knew of a subordinate's motive.").

The Norgrens failed to plead that Commissioner Harpstead personally engaged in an adverse action motivated by purposeful, invidious retaliation for the Norgren's constitutionally protected speech, and the district court correctly dismissed their Section 1983 claims.

**B.** **The Norgrens Fail to State Plausible First Amendment Retaliation Claims.**

The Norgrens' Section 1983 claims also fail because they have not alleged facts to plausibly support a First Amendment Retaliation claim. To state such a claim, plaintiffs must plead facts showing: (1) they engaged in activity protected by the First Amendment; (2) "the government official took adverse action against [them] that would chill a person of ordinary firmness from continuing in the activity"; and (3) "the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d at 876; *accord In re Kemp*, 894 F.3d 900, 906 (8th Cir. 2018). With respect to the first element, the Norgrens must show that they "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). With respect to the third element, the defendant's retaliatory motive must be a "substantial factor" or "but-for cause" of the adverse action. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).

22

### 1. Joseph Fails to State a Plausible First Amendment Retaliation Claim.

In Count IV, Joseph alleges engaging in constitutionally protected speech by: (1) requesting an exemption from the gender identity awareness training; and (2) expressing his viewpoint on gender when answering a question from a night supervisor.[78]

As for the first statement, while gender identity may be a popular topic in public discourse, requesting an exemption from across-the-board training is not a matter of public concern. Rather, it is a run-of-the-mill employment concern, and the First Amendment does not "constitutionalize" employee grievances. *Garcetti*, 547 U.S. at 420 (citing *Connick*, 461 U.S. at 154).

As for the second statement, Joseph's answer about gender solicited by a DHS night supervisor back in 2018 was not of concern to the community. Joseph felt he was duty-bound to respond to the supervisor because he was "on shift."[79] Joseph did not publicly post his viewpoints about gender identity or about DHS' training program. Joseph was simply answering the supervisor's questions while at work about his personal views. *See Connick*, 461 U.S. at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a

---

[78] App. 88; R. Doc. 15, at 12, ¶¶ 64-65 (Joseph).
[79] App. 82-83; R. Doc. 15, at 6-7, ¶ 28 (Joseph).

Appellate Case: 23-1207     Page: 34     Date Filed: 04/27/2023 Entry ID: 5270019

federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

Even if this Court finds that Joseph plausibly pleaded protected activity, his claim immediately breaks down at the next required element of a First Amendment retaliation claim – that a government official took adverse action to chill a person of ordinary firmness from continuing the activity.[80] Joseph's complaint lacks any allegations from which the Court could infer that Commissioner Harpstead personally took any adverse action against Joseph to chill his exercise of any First Amendment right to request an exemption from gender identity training, or respond to his supervisor's question seeking his personal viewpoint on gender. Indeed, Joseph conceded as much to the district court when he claimed his purported constructive discharge was "an official act of DHS policy," not any personal conduct by Commissioner Harpstead.[81] In sum, this Court should affirm the dismissal of Count IV in Joseph's Complaint, because he fails to state a plausible First Amendment Retaliation claim against Commissioner Harpstead.

---

[80] App. 88-90; R. Doc. 15, at 12-14 (Joseph).
[81] R. Doc. 29, at 33-34 (Joseph) ("This was done through Commissioner Harpstead's direction, as an official act of DHS policy, …").

### 2. Aaron Fails to State a Plausible First Amendment Retaliation Claim.

Aaron's First Amendment retaliation claim is based entirely on conclusory legal assertions. Aaron alleges that Commissioner Harpstead engaged in promotion discrimination "through an act of official DHS policy" and "willfully deprived Plaintiff of his right to freedom of speech and his freedom of religion" without pleading any factual assertions, which if true, would support such a claim.[82] But labels and conclusions are insufficient to state a legal claim. *E.g., Iqbal*, 556 U.S. at 678.

Aaron alleges that requesting an exemption from DHS' mandatory gender-identity awareness training is constitutionally protected activity.[83] But like his father's claim, requesting a religious exemption from an employment training requirement does not entitle Aaron to First Amendment protection because it does not involve speaking "on a matter of public concern." *Garcetti*, 547 U.S. at 418. Even assuming Aaron's exemption request suffices as constitutionally protected conduct, his complaint is devoid of factual content that would allow this Court to draw the inference that Commissioner Harpstead personally took any adverse action against him to chill his speech or for any other reason. Likewise, Aaron's claim is devoid of allegations that Commissioner Harpstead had any personal involvement

---

[82] App. 13-14; R. Doc. 1, at 13-14 (Aaron).
[83] App. 13; R. Doc. 1, at 13, ¶ 76 (Aaron).

Appellate Case: 23-1207     Page: 36     Date Filed: 04/27/2023 Entry ID: 5270019

in determining that he did not meet the required qualifications for Permanent Supervisor Position or was even aware that he had applied. In fact, the only person Aaron identifies as having any involvement in his failed application is Patrick Patterson from DHS' Human Resources, not the Commissioner.[84]

Aaron's thread-bare and conclusory allegations that Commissioner Harpstead "engaged in promotion discrimination against" him are insufficient to state a claim.[85] *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, Aaron failed to plead facts plausibly demonstrating that he was qualified for a promotion.[86] Accordingly, this Court should affirm the dismissal of Aaron's Section 1983 claims.

## C. The Norgrens Fail to State Plausible First Amendment Compelled Speech Claims.

The First Amendment prevents the government from "[c]ompelling individuals to mouth support for views they find objectionable." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448at, 2463 (2018). To state a compelled speech claim, a plaintiff must plead facts showing: "(1) speech, (2) that the speaker objects to, that (3) the government compels." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015).

---

[84] App. 9; R. Doc. 1, at 9, ¶ 42 (Aaron).
[85] App. 13; R. Doc. 1, at 13, ¶¶ 82-84 (Aaron).
[86] *See*, Factual Background, Section I(C), *supra*.; Argument, Section II(A) *infra*.

Significantly, the Norgrens' complaints are devoid of any factual allegations showing that Commissioner Harpstead personally required them (or any other employees attending the training) to affirmatively make, or refrain from making, any statements in front of a supervisor or to submit an affidavit to that effect. There was no speech involved here; the Norgrens, along with all of their colleagues, were simply expected to watch two diversity training videos. Nor do the Norgrens allege facts showing that they (or any of their co-workers) were told they would be deemed insubordinate, subject to discipline, discharged, or otherwise penalized if they failed to watch the videos, or unless they made or refrained from making certain statements. To the contrary, all that was required of every DHS employee was to watch two training videos on their computers and, when complete, exit out of the program. *See Iqbal*, 556 U.S. at 677 ("[T]o state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter . . . ."). Any perceived threats of discipline or termination are pure speculation.

The Norgrens both contend they asserted compelled speech claims against Commissioner Harpstead in her individual capacity. But Joseph's complaint is the only one that alleges, vaguely, that Defendant "demanded that [he] apply the 'anti-racist' trainings in HR 670.1 by admitting to, confessing, or refraining from using certain language related to beliefs about racism and the United States as the root

27

of a racist system and culture."[87] For his part, Aaron's complaint fails to allege any compelled speech claim at all.[88] Nevertheless, assuming *arguendo* that he did, Aaron's compelled speech claim, like much of his complaint, is a carbon copy of his father Joseph's and fails for the same reasons.

Shorn of conclusory allegations, the only specific facts alleged and attributed to Commissioner Harpstead personally are the prefatory remarks she gave to all DHS employees announcing the training videos "where she *urged* a focus on 'the training and brave conversations we need to have to change … minds for life.'"[89] Commissioner Harpstead's words encouraging employees to "focus on the training" do not demonstrate that she compelled or silenced anyone's speech, as required by the third element of the claim.[90]

In sum, the Norgrens fail to plausibly state compelled speech claims and this Court should affirm their dismissal.

---

[87] Joseph's complaint only refers to "Defendant" and does not specify whether he is referring to DHS or Commissioner Harpstead. App. 61; R. Doc. 15, at 13, ¶ 67 (Joseph).

[88] App. 13-14; R. Doc. 1, at 13-14 (Aaron).

[89] App. 14; R. Doc. 1, at 14, ¶ 82 (Aaron) (emphasis added). App. 89; R. Doc. 15, at 13, ¶ 70 (Joseph) (emphasis added).

[90] The Norgrens' only other specific factual allegation refers to a comment made by an assistant commissioner who presented the anti-racism training, telling employees "we need all of you to do this." App. 79; R. Doc. 15, at 3, ¶ 15 (Joseph). App. 3-4; R. Doc. 1, at 3-4, ¶ 16.

Appellate Case: 23-1207     Page: 39     Date Filed: 04/27/2023 Entry ID: 5270019

**D. Commissioner Harpstead is Entitled to Qualified Immunity.**

This Court should affirm the district court's dismissal of the claims against Commissioner Harpstead because she is entitled to qualified immunity. Qualified immunity shields government officials from Section 1983 lawsuits and liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013). "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019). Here, the Norgrens fail to satisfy either prong.

First, as previously discussed, the Norgrens have failed to plead facts to support First Amendment retaliation or compelled speech claims.

Second, the district court correctly concluded that the Norgrens failed to point to any controlling United States Supreme Court or Eighth Circuit precedent, or even "robust consensus of cases of persuasive authority," where a court held an individual defendant liable for First Amendment retaliation or compelled speech for requiring all employees to attend diversity training even where they had no personal involvement with the underlying "particularized" facts. *Bus. Leaders In Christ v. Univ. of Iowa*, 991 F.3d 969, 980 (8th Cir. 2021); *see also White v. Pauly*, 580 U.S.

29

73, 79 (2017) (holding that the controlling authority must present "similar circumstances.").

In fact, controlling Eighth Circuit precedent holds the opposite. *Altman v. Minn. Dep't of Corrections*, 251 F.3d, 1199, 1202-1203 (8th Cir. 2001) (holding that "a public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate. An employee who refuses to be trained has, from the employer's reasonable perspective, impeded his or her ability to do the job.").

Moreover, requiring public employees to attend diversity training is well within the constitutional limits of a public employer, is required by federal and state laws. Title VII and the MHRA prohibit discrimination, harassment, and retaliation against employees on the basis of race, color, religion, national origin, sex, which includes gender identity and sexual orientation. *See* 42 U.S.C. § 2000e-2(a)(1), 2000e-3; Minn. Stat. § 363A.08. DHS also has a legal obligation to provide antidiscrimination training insofar as its employees must provide public services to constituents on a non-discriminatory basis, including individuals involuntarily committed in the state security hospital. See, 42 U.S.C. §§ 2000b to 2000b-3; Minn. Stat. § 363A.12. Accordingly, Commissioner Harpstead is entitled to qualified immunity on the Norgrens' First Amendment retaliation claims.

The Norgrens' reliance on *Janus* is misplaced because the Court itself states its analysis is not applicable "in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" 138 S. Ct. at 2472.[91] *Telescope Media Group v. Lucero* is inapposite because it involves a First Amendment challenge to the public accommodation provision of a state civil rights law; it has nothing to do with the First Amendment rights of public employees. 936 F.3d 740 (8th Cir. 2019). Similarly inapposite are the Norgrens' references to landmark First Amendment cases involving military recruiting in law schools and public school students refusing to say the pledge of allegiance.[92] None of these cases present "similar circumstances" remotely similar to this case, and none question the constitutionality of the Norgrens' factual allegations against Commissioner Harpstead at all, much less place them "beyond question." *Pauly*, 580 U.S. at 79; *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018).

This Court should affirm the district court's rulings granting Commissioner Harpstead qualified immunity and dismissing the Norgrens' Section 1983 claims because she did not violate a right that was clearly established at the time of the alleged conduct.

---

[91] App. Br., 48. Also, *Janus* was not a compelled speech case. *Janus* was a compelled-subsidy case, where an individual alleged that he was required by the government to subsidize speech he disagreed with, expressed by a private entity. 138 S. Ct. at 2472.

[92] App. Br., 49.

31

## II. AARON FAILS TO STATE A PLAUSIBLE TITLE VII RETALIATION CLAIM.

In Count III, Aaron alleges that after he filed a charge of discrimination with the EEOC, DHS retaliated against him by denying him a promotion he was not qualified to receive.[93] Of course, filing an EEOC Charge is protected activity under Title VII, and Title VII prohibits retaliation against an employee who engages in protected activity. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (*citing* 48 U.S.C. § 2000e–3(a)).[94] But to state a retaliation claim, an employee must also plead facts showing that he suffered a materially adverse action that would deter a reasonable employee from making a charge of employment discrimination, and a causal connection between his EEOC Charge and the adverse employment action. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856-57 (8th Cir. 2012). Causation in this context means the plaintiff must show that "his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The causation standard in retaliation claims is more stringent than in standard, status-based discrimination claims, as plaintiffs must allege but-for causation. *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017).

---

[93] Aaron's argument that he was also retaliated against when DHS temporarily denied him a weather-related day off has been waived. *See* n. 50, *supra*.

[94] Appellees agree that Aaron engaged in protected activity when he filed his EEOC Charge on June 25, 2021.

Appellate Case: 23-1207     Page: 43     Date Filed: 04/27/2023 Entry ID: 5270019

Aaron's retaliation claim fails for three reasons. First, Aaron's reliance on the timing of his rejection for the Permanent Supervisor Position is insufficient to infer causation because he was not qualified for the position. Second, Aaron fails to plead facts suggesting that decisionmakers knew of his protected activity when rejecting his application for the Permanent Supervisor Position. Third, Aaron fails to plead facts showing that DHS ever filled the Permanent Supervisor Position or that it was filled by anyone outside his protected class who was similarly or less qualified.

### A. The Timing of Aaron's Rejection Was Merely Coincidental Because He Was Not Qualified For the Permanent Supervisor Position.

Aaron pleads that DHS's retaliatory motive can be inferred based solely on the three-week period between the filing of his EEOC Charge and his disqualification for the Permanent Supervisor Position. But, like the District Court recognized, "the mere timing of these events is not, by itself, sufficient to state a plausible claim." *See*, R. Doc. 22, at 10 (Aaron) (citing *Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). Further, when assessing a claim's plausibility, this Court will engage in the "context-specific task" of viewing the pleadings as a whole, and will not ignore "lawful, 'obvious alternative explanations' for the alleged conduct" that would render Aaron's complaint implausible. *Wilson,* 850 F.3d at 373 (quoting *Iqbal*, 556 U.S. at 682). Thus, a court will find that "an inference pressed by the plaintiff is not plausible if the facts he

Appellate Case: 23-1207     Page: 44     Date Filed: 04/27/2023 Entry ID: 5270019

points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009). Viewing the pleadings as a whole, this Court should conclude that Aaron was not qualified for the position and the timing of Aaron's disqualification was merely coincidental. *Iqbal*, 556 U.S. at 679.

In order to claim that a promotion was unlawfully denied, it is axiomatic that a plaintiff must plausibly allege they were qualified for the position. *Nelson v. USAble Mut. Ins. Co.,* 918 F.3d 990, 993 (8th Cir. 2019); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) ("An employee must show that her qualifications are equivalent to the minimum objective criteria."). Here, Aaron fails to allege facts plausibly showing that he met the minimum experience requirements for the Permanent Supervisor Position.[95] Aaron's objective lack of required experience is an obvious alternative explanation that eliminates any causal connection that could be inferred by the mere timing of his rejection for the position. *See Blomker*, 831 F.3d at 1060 (affirming dismissal where attachment encompassed by the pleadings showed "on its face" that protected activity was not a but-for cause of adverse action).

Although Aaron contends that he met the minimum requirements by qualifying for the bachelor's degree or other experience credit listed on the job

---

[95] *See*, Factual Background, Section I(C), and n. 51-64, *supra*.

posting. This argument only works if he ignores the clear "up to 6 months" limit on the experience credit for having a degree or unrelated supervisory experience, not both.[96] Although Aaron was eligible for a 6-month qualifying experience credit, but regardless of whether he filed an EEOC Charge, he lacked any other qualifying experience for the Permanent Supervisor Position and was properly disqualified for the job.

Next, Aaron claims his qualifications for the Permanent Supervisor Position can be inferred because DHS considered him for a Temporary Supervisor Position. But again, these two jobs, and their minimum experience requirements, were objectively different.[97] Similarly, it is pure speculation to assume that Director Wondra's March 1, 2021 encouragement to Aaron to "keep your eyes open" for a "posting for the permanent assignment *in the next couple weeks*," permit an inference that he was qualified for a Permanent Supervisor Position posted nearly *four months* later with different minimum experience requirements.[98]

---

[96] App. 27-29; R. Doc. 10-2, at Ex. B (emphasis added). Under Aaron's reading, granting experience credit for outside supervisory experience *and* a bachelor's degree would make an exception that swallows the qualifying experience rule.

[97] *Compare* App. 25-26; R. Doc. 10-1, at 1-2 (Aaron) *with* App. 27-29; R. Doc. 10-2, at 1-3 (Aaron).

[98] While Director Wondra's encouragement to Aaron does not plausibly infer his qualifications for the Permanent Supervisor Position, it does permit an inference that DHS did not hold any retaliatory animus against Aaron for his Fall 2020 objections to the anti-racism or gender identity trainings.

Finally, Aaron offers the conclusory assertion that his qualifications can be inferred because he "had previously been considered for other positions with the same requirements." This vague and conclusory allegation does not state which positions, if any, he was previously considered for or whether their requirements were the same as the temporary position (which he met) or the permanent position (which he did not), and is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-79.

This Court's decision in *McPherson v. Brennan* reviving a rejected job applicant's dismissed complaint provides an instructive contrast that demonstrates what Aaron's claim lacks. 888 F.3d 1002 (8th Cir. 2018). There, a rejected applicant's complaint was dismissed because he lacked a specific certification for the job he sought, which was an objective requirement on the job posting. This Court reversed, because the rejected applicant pled sufficient additional facts showing that (1) the criteria the employer used in evaluating qualifications differed from those listed in the job posting, (2) the selected applicant also lacked objective requirements listed on the job posting, and (3) the selected applicant was outside the plaintiff's protected class. These facts, pled with sufficient factual specificity, permitted a plausible inference of disparate treatment.

Like the plaintiff in *McPherson*, Aaron believes he was subjected to disparate treatment in a hiring process. But the similarities start and end there, because unlike

36

*McPherson*, Aaron failed to plead any facts showing that (1) he possessed the objective minimum experience required for the Permanent Supervisor Position; (2) DHS considered other applicants who lacked the objective minimum experience requirements in the job posting; (3) the individual selected for the position lacked the objective minimum experience requirements; and (4) the selectee was outside of Aaron's protected class (i.e., they did not file an EEOC Charge).[99] Absent at least some of these additional facts, Aaron's complaint only plausibly demonstrates his misplaced optimism in his qualification for a promotion. Aaron pleads no facts plausibly permitting an inference that but-for his EEOC Charge, he would have been selected for the Permanent Supervisor Position.[100] Accordingly, the district court correctly dismissed Aaron's retaliation allegations for failure to state a claim.

---

[99] Aaron contends that expecting a rejected applicant to have information about the relative qualifications of other applicants or the ultimate selectee is too high an imposition at the pleading stage. In some cases that may be true. But the claim here is for an internal promotion in a workplace where Aaron has been continuously employed since before the events in this case through the present day. It is not unreasonable to expect that nearly two years later, as a current employee at the same facility, that he would learn who obtained the promotion he believes he was unlawfully denied, assuming DHS hired anyone at all. Further, in Minnesota at least, the relative qualifications of applicants for state jobs, including the name(s) of any finalists, are public data that any person can obtain upon request. *See* Minn. Stat. § 13.43, subd. 3 (2022). In the context of this case, on these specific allegations, Aaron should be expected to present more factual allegations than he did.

[100] In response to Defendants' Motion to Dismiss, Aaron could have elected to file an Amended Complaint – like Joseph did – to add facts (or a resume) demonstrating that he met the minimum experience requirements for the Permanent Supervisor Position. He did not.

Appellate Case: 23-1207   Page: 48   Date Filed: 04/27/2023 Entry ID: 5270019

## B.  Aaron Fails to Plead that DHS Decisionmakers Knew of His EEOC Charge.

Although the district court did not reach this issue, DHS argued that Aaron's retaliation claim also fails because he has not alleged facts plausibly suggesting that any DHS decisionmaker(s) involved in rejecting his application for the Permanent Supervisor Position were even aware of Aaron's EEOC Charge at the time. It is axiomatic that an employer can only make decisions based on the information known to it at the time of the decision. *See e.g.*, *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022) (*citing Porter v. City of Lake Lotawana*, 651 F.3d 894, 898 (8th Cir. 2011) (holding that retaliation claim "is only plausible if the decision makers had knowledge of her" protected activity)); *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006) (holding that causation requires proof decision maker was aware of protected activity at time of adverse employment action; assertions that decisionmakers knew because some members of human resources knew about complaint are insufficient); *cf. Iqbal*, 556 U.S. at 686–87 ("Rule 9 merely excuses a party from pleading [knowledge] under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8.").

Because this Court may affirm on "any basis supported by the record," Aaron's failure to plead any facts plausibly inferring that any DHS decisionmaker knew of his EEOC charge at the time he was disqualified for the Permanent

38

Supervisor Position provides an independent basis to affirm the dismissal of Aaron's Title VII retaliation claim. *Fullington v. Pfizer, Inc.*, 720 F.3d 739, 747 (8th Cir. 2013) (affirming grant of a motion to dismiss on an alternative ground).

### C. Aaron Fails to Plead That DHS Filled the Position or that it was Filled with a Similarly Situated Person Outside his Protected Class.

Aaron's complaint lacks any factual allegations that DHS ever filled the Permanent Supervisor Position, or any allegations that a similarly situated person who did not engage in protected activity was treated more favorably. *Warmington,* 998 F.3d at 798 (finding no plausible inference of sex discrimination because plaintiff failed to plead specify the sex of the "other coaches" who were treated differently, "leaving this court unable to conclude she was only treated differently than other male coaches"); *Hager*, 735 F.3d at 1015 (dismissing employee's discrimination complaint where employee's conclusory pleading does not allege facts showing that similarly situated employees were treated differently). Because Aaron does not plead facts about any similarly situated comparators, or any other facts supporting an inference of discrimination, he has failed to state a claim of retaliation under Title VII.

Accordingly, this Court should affirm the dismissal of Aaron's retaliation claim against DHS.

Appellate Case: 23-1207     Page: 50     Date Filed: 04/27/2023 Entry ID: 5270019

## III. THE NORGRENS FAILED TO PLEAD PLAUSIBLE RELIGIOUS DISCRIMINATION CLAIMS.

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of that individual's religion. 42 U.S.C. § 2000e–2(a)(1). To establish a prima facie case of religious discrimination, the Norgrens need to show (1) they are a member of a protected class; (2) they informed their employer of their religious beliefs; (3) they were qualified for the position; (4) they suffered an adverse employment action; and (5) similarly situated employees outside of their protected class were treated differently, or there is other evidence giving rise to an inference of discrimination. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015). Because the Norgrens failed to plead facts plausibly stating religious discrimination claims, and this Court should affirm their dismissal.

### A. Joseph Fails to State a Plausible Claim of Religious Disparate Treatment.

In Count II of his complaint, Joseph alleges that he was subjected to a hostile work environment based on his religious beliefs that resulted in his constructive discharge.[101] The district court correctly dismissed this claim for several reasons.

---

[101] App. 87; R. Doc. 15, at 11, ¶ 56 (Joseph).

### 1. Joseph Fails to State a Plausible Constructive Discharge Claim.

To prove constructive discharge, a plaintiff must show: "(1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616–17 (8th Cir. 2007). A party seeking to establish a constructive discharge "shoulders a substantial burden." *Blake v. M.J. Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017). The United States Supreme Court has recognized that a plaintiff advancing a compound hostile-environment constructive discharge claim must plead facts that go beyond severe or pervasive conduct, and show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 146-47 (2004). Joseph's complaint does not meet this substantial burden.

Joseph alleges that three discrete incidents of religious discrimination caused his constructive discharge on January 6, 2021.[102] The first incident, which Joseph never reported to DHS, is the alleged October 2018 comment from a night supervisor that "he could be terminated for what he thought and spoke."[103] The second and third incidents were DHS's "mandated training and refusal for exemption" that occurred

---

[102] Joseph's counsel confirmed before the District Court that his hostile environment allegations consist of only these three discrete acts. R. Doc. 47, at 25-27 (Joseph).
[103] App. 86-87; R. Doc. 15, at 10-11, ¶¶ 54-56 (Joseph).

41

in September and October 2020.[104] It is implausible to suggest that these three discrete incidents would compel a reasonable person to retire.

First, a single comment from a night-shift supervisor in 2018 that was never reported is not plausibly connected to the September 2020 gender identity training or DHS's October 2020 decision denying his exemption from watching the gender identity training video. *See Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 359 (8th Cir. 2020) (holding that investigator's biased comment during a prior investigation, when the investigator is not involved in the present investigation, does not plausibly infer discriminatory motive by the university). The alleged 2018 comment by Supervisor Pherson is a quintessential stray remark; it occurred well-beyond the 300-day charge filing period and is untethered to the diversity trainings or denial of Joseph's exemption request in September and October 2020.[105]

Moreover, Joseph's own complaint demonstrates his decision to retire was not related to the 2018 comment, the September 2020 gender identity video, the denial of his request for an exemption, or any combination thereof. On October 6, 2020 –

---

[104] App. 84; R. Doc. 15, at 8, ¶ 33 (Joseph).

[105] 42 U.S.C. § 2000e-5(e)(1) (individuals in states that have a state or local fair employment practices agency have up to 300 days after the last act to file a charge). Whether untimely incidents were a part of a continuing violation, courts consider whether the same harasser committed the same harassing acts before and after the limitation's deadline; whether the employer was made aware of the earlier harassment; and whether there was any "intervening action" by the employer that make the later acts of harassment unrelated to the earlier, otherwise untimely acts. *See, Rowe v. Hussmann Corp.*, 381 F.3d 775, 781 (8th Cir. 2004).

Appellate Case: 23-1207    Page: 53    Date Filed: 04/27/2023 Entry ID: 5270019

three weeks before DHS denied his exemption request (October 27, 2020) and before he made his first-ever report of harassment to DHS (October 30, 2020) – he announced his retirement effective January 6, 2021. Indeed, Joseph was clear that DHS's denial of his exemption request simply "confirmed" his decision to retire, it did not cause it.[106]

Furthermore, to assert a constructive discharge claim, Joseph must allege he gave DHS notice of the problem and a reasonable opportunity to correct it. *Jackson v. Ark. Dep't of Educ.*, 272 F.3d 1020, 1027 (8th Cir. 2001) (holding that employee did not give employer a reasonable opportunity to correct the problem because she did not notify it until the harassment had been ongoing for nine months). Here, Joseph did not report any harassment of any kind to DHS until October 30, 2020, three weeks *after* he announced his retirement and with barely more than two weeks left on duty. A reasonable person would not have waited until the last two working weeks of a 27-year career to report harassment so intolerable it caused him to retire early. Accordingly, Joseph fails to allege facts to plausibly support a constructive discharge or adverse employment action, and this Court should affirm the dismissal of his religious discrimination claim.

---

[106] App. 83; R. Doc. 15, at 7, ¶ 32. App. 75-76; R. Doc. 12-2, at Ex. B (Joseph).

43

Second, Joseph's claim that DHS's "mandated training and refusal for exemption" caused his constructive discharge is similarly implausible.[107] Joseph's son Aaron, who alleges his beliefs are identical to his father's, was mandated to attend the same trainings and was denied the same religious exemption. But this did not make Aaron's working conditions so intolerable he was forced to quit. In fact, DHS employs Aaron in the Forensic Mental Health Program to this day.

Likewise, mandating that all employees attend diversity training does not plausibly show that DHS intended to force Joseph to quit – or anyone else for that matter. *Altman*, 251 F.3d at 1203. Employers run afoul of Title VII in this context only when they require only employees of one protected class to be trained, or affirmatively require employees to ascribe to or affirm certain beliefs. *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494 (D. Md. 2019) (dismissing religious disparate treatment claim for Christian plaintiff's failure to identify similarly situated employees of a different religion (or no religion) who were excused from answering questions about transgender individuals during ethics training); *Buonanno v. AT&T Broadband, LLC*, 313 F. Supp. 2d 1069, 1081-83 (D. Colo. 2004) (holding that company could require employee to attend diversity training but failed to accommodate his religious beliefs by refusing exemption from signing a diversity policy); *cf. Devine v. Pittsburgh Bd. of Pub. Educ.*, No. 2:13-cv-220, 2015 WL

---

[107] App. 84; R. Doc. 15, at 8, ¶¶ 33, 35-36 (Joseph).

Appellate Case: 23-1207    Page: 55    Date Filed: 04/27/2023 Entry ID: 5270019

3646453 (W.D. Pa. June 10, 2015) (allowing Title VII race discrimination claim to proceed where only white teachers were required to undergo racial-sensitivity trainings, but similarly situated Black teachers were not).

Indeed, many state laws require iterations of diversity training for public employees, like Joseph.[108] Moreover, the training at issue in the *Altman* case involved a topic where many employees' religious beliefs differed about the subject matter, but the state was still within its right to mandate attendance. 251 F.3d at 1200 (involving training program called "Gays and Lesbians in the Workplace"). And while Joseph was understandably disappointed that his request for exemption was denied, the mere denial of a reasonable accommodation after thoughtful consideration by the employer is not objectively offensive.

Viewed collectively, these three incidents occurring over a period of two years do not rise to the severe or pervasive level that this Court has found necessary to establish a hostile work environment, much less the high bar required to establish a constructive discharge claim. *Warmington*, 998 F.3d at 800 (citing *Blomker*, 831 F.3d at 1057 (collecting cases)).

---

[108] Florida, Illinois, Nevada, Oklahoma, Tennessee, Texas, and Utah, among others, require anti-discrimination training for specified public employees. *See* Fla. Stat. Ann. §110.112 (West 2016); 775 Ill. Comp. Stat. Ann. 5/2-105(B)(5) (2023); Nev. Admin. Code 284.496 (2022); Tenn. Code Ann. § 4-3-1703 (2012); Tex. Labor Code Ann. § 21.010 (West 2021); Utah Admin. Code R477-10-4 (2022).

Appellate Case: 23-1207      Page: 56      Date Filed: 04/27/2023 Entry ID: 5270019

### 2. Joseph Fails to Plead Facts Plausibly Permitting an Inference of Discrimination.

Even assuming that Joseph could demonstrate an adverse employment action, the district court correctly found that Joseph failed to plead factual allegations that any similarly situated employees outside his protected class were treated more favorably, or any other facts plausibly supporting an inference of discrimination.

Joseph simply alleges that DHS discriminated against him and treated him "distinct [sic] from other similarly situated employees" due to his religious beliefs.[109] This is precisely the type of factually-deficient legal conclusion this Court had rejected in the past. *See*, *Warmington*, 998 F.3d at 798; *Hager*, 735 F.3d at 1015.

Accordingly, Joseph fails to state a claim of religious disparate treatment under Title VII, and this Court should affirm its dismissal.

### B. Aaron Fails to State a Plausible Claim of Religious Disparate Treatment.

In Count II of his Complaint, Aaron simply repackages his retaliation claim as a religious disparate treatment claim.[110] This is evident from the fact that he does not allege that DHS's discrimination (denial of the Permanent Supervisor Position) was motivated by status as a Christian. Rather, Aaron contends he was discriminated against because of "his *opposition* to the Gender Identity Training, as a Christian,"

---

[109] App. 87; R. Doc. 15, at 11, ¶ 57 (Joseph).
[110] App. 11; R. Doc. 1, at 11, ¶¶ 64, 66 (Aaron).

46

as he "had been considered to have met the minimum qualifications before *speaking out against* the Gender Identity Training."[111] In other words, Aaron alleges that DHS's adverse action was motivated by his protected *activity* (i.e. opposition to gender identity training), not his protected *status* (i.e. Christian). *Wagner v. Jones*, 664 F.3d 259, 269 (8th Cir. 2011)(citing *White*, 548 U.S. at 63 (reasoning that Title VII's discrimination "provision seeks to prevent injury to individuals based on who they are, (i.e., their status), while Title VII's antiretaliation provision seeks to prevent harm to individuals based on what they do, (i.e., conduct).) Because Aaron fails to allege that he was discriminated against because of his protected status (i.e. Christian), he necessarily fails to state a plausible claim of religious discrimination.

But even assuming this omission is not fatal to his claim, Aaron's religious disparate treatment claim still fails because it is devoid of facts plausibly alleging an adverse action, that similarly situated applicants outside his protected class were treated more favorably, and lacks any other allegations plausibly suggesting discriminatory intent.

First, Aaron was not qualified for the Permanent Supervisor Position, so his rejection for the position was not an adverse action.[112] *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981) (holding that the role of the qualification prong

---

[111] *Id*. (emphasis added).
[112] *See*, Factual Background, Section I(C), *supra*.; Argument, Section II(A), *supra*.

Appellate Case: 23-1207    Page: 58    Date Filed: 04/27/2023 Entry ID: 5270019

is simply to help "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n. 44 (1977) ("[T]he McDonnell Douglas formula ... demand[s] that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.").

Second, Aaron fails to plead facts plausibly supporting his claim that similarly situated employees were treated more favorably. Aaron was disqualified for the Permanent Supervisor Position because he did not meet the objective, minimum experience requirements. Therefore, to state a claim of religious disparate treatment, Aaron needed to plead some facts showing non-Christians who lacked the minimum required experience were not disqualified or were treated more favorably in the hiring process. Aaron fails to do this. Instead, Aaron's Complaint formulaically recites that "[o]ther similarly-situated employees, who are not in the same protected class as Plaintiff, were not denied the opportunity for such a promotion."[113] This is a legal conclusion devoid of factual content and is insufficient to allege a plausible claim. *Warmington*, 998 F.3d at 798; *Hager*, 735 F.3d at 1015; *see also Iqbal*, 556 U.S. at 678.

---

[113] *Id*.

Appellate Case: 23-1207     Page: 59     Date Filed: 04/27/2023 Entry ID: 5270019

Accordingly, because Aaron fails to allege facts that plausibly infer he was subjected to religious disparate treatment under Title VII, this Court should affirm the dismissal of this claim.

## CONCLUSION

Because the Norgrens fail to state plausible claims under section 1983 or Title VII, and because the Commissioner is entitled to qualified immunity for the Section 1983 claims, Appellees respectfully asks this Court to affirm the dismissal of their complaints with prejudice.

Dated:  April 26, 2023

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


s/Nick Pladson
NICK PLADSON
Assistant Attorney General
Atty. Reg. No. 0388148

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 300-7083 (Voice)
(651) 296-7438 (Fax)
Nick.Pladson@ag.state.mn.us

ATTORNEY FOR APPELLEES

49

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,642 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

s/Nick Pladson
NICK PLADSON
Assistant Attorney General

50

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies

that the brief has been scanned for viruses and that the brief is virus-free.

**s/Patricia Brunelle**

**PATRICIA BRUNELLE**

Appellate Case: 23-1207   Page: 62   Date Filed: 04/27/2023 Entry ID: 5270019