# In the
# United States Court of Appeals
# for the Eighth Circuit

**23-1207**

Aaron Norgren,

*Plaintiff-Appellant,*

v.

Minnesota Department of Human Services, et al.,

*Defendants-Appellees.*

**23-1208**

Joseph Norgren,

*Plaintiff-Appellant,*

v.

Minnesota Department of Human Services, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Douglas P. Seaton
James V. F. Dickey
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN  55426
(612) 428-7002

*Attorneys for Plaintiffs-Appellants*

Appellate Case: 23-1207     Page: 1     Date Filed: 05/19/2023 Entry ID: 5278946

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................... **i**

**TABLE OF AUTHORITIES** ........................................................... **ii**

**REPLY ARGUMENT** ...................................................................... **1**

I.  The Norgrens Have Pleaded Sufficient Facts to Establish Their First Amendment Claims Against Commissioner Harpstead. ............................. 1

   A. Commissioner Harpstead Acted Personally and Purposefully to Violate the Norgrens' Constitutional Rights. ........................................................ 1

   B. The Norgrens Have Sufficiently Pleaded First Amendment Retaliation. 4

      1.  Joseph Stated a Plausible Claim for First Amendment Retaliation. ... 4

      2.  Aaron Stated a Plausible Claim for First Amendment Retaliation. ... 7

   C. The Norgrens Stated Plausible First Amendment Compelled Speech Claims. ..................................................................................................... 11

   D. Commissioner Harpstead Is Not Entitled to Qualified Immunity. .......... 13

II.  Aaron Stated a Plausible Title VII Retaliation Claim. .................................. 14

III. Joseph Stated a Plausible Claim for Religious Discrimination. ................... 19

IV. Aaron Pleaded Sufficient Facts to State a Plausible Claim for Religious Discrimination. ............................................................................................... 23

**CONCLUSION** ............................................................................... **25**

**CERTIFICATE OF COMPLIANCE** ......................................... **26**

**CERTIFICATE OF SERVICE** ................................................... **27**

i

# TABLE OF AUTHORITIES

**Statutes**

Minn. Stat. § 13.03, subd. 2(a)................................................................17

**Cases**

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001) ............... 12, 22, 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................1

*Bonner v. Outlaw*, 552 F.3d 673 (8th Cir. 2009)......................................3

*Buettner v. E. Arch Coal Sales Co.*, 216 F.3d 707 (8th Cir. 2000) .........18

*Connick v. Myers*, 461 U.S. 138 (1983).................................................6

*Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*,
  555 U.S. 271 (2009)..................................................................6

*Crawford-El v. Britton*, 523 U.S. 574 (1998) .......................................2, 3

*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015)..........................2

*EEOC v. N. Mem'l Health Care*, 908 F.3d 1098 (8th Cir. 2018)..............5

*Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014).......................................1

*Garcetti v. Ceballos,* 547 U.S. 410 (2006) ...........................................6

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993)............................................19

*Hope v. Pelzer*, 536 U.S. 730 (2002).....................................................14

*Jackson v. Nixon*, 747 F.3d 537 (8th Cir. 2014) ............................... 1, 3, 7

*Leighton v. Madison Cent. Sch. Dist. #39-2*, No. 4:16-CV-04079-RAL,
  2018 U.S. Dist. LEXIS 167924 (D.S.D. Sep. 28, 2018) ...................24

*McPherson v. Brennan*, 888 F.3d 1002 (8th Cir. 2018) .........................16

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ..............................5

*Monteer v. ABL Mgmt.*, No. 4:21-CV-756 ACL, 2022 U.S. Dist.
  LEXIS 155987 (E.D. Mo. Aug. 30, 2022)......................................5

*O'Bryan v. KTIV Television*, 64 F.3d 1188 (8th Cir. 1995) ....................15

*Pa. State Police v. Suders*, 542 U.S. 129 (2004) ...................................21

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ................................................13

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)................................16

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ..............2

Appellate Case: 23-1207     Page: 3     Date Filed: 05/19/2023 Entry ID: 5278946

*Turner v. Gonzales*, 421 F.3d 688 (8th Cir. 2005)..................................................16

*United States v. Lanier*, 520 U.S. 259 (1997)..........................................................14

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)..................................25

*Warmington v. Bd. of Regents of the Univ. of Minn.*, 998 F.3d 789
   (8th Cir. 2021)......................................................................................................19

*Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368 (8th Cir. 2017).............. 16, 19

### Other Authorities

"Require," Merriam-Webster.com Dictionary, https://www.merriam-
   webster.com/dictionary/require ...........................................................................12

Appellate Case: 23-1207   Page: 4   Date Filed: 05/19/2023 Entry ID: 5278946

# REPLY ARGUMENT

## I. The Norgrens Have Pleaded Sufficient Facts to Establish Their First Amendment Claims Against Commissioner Harpstead.

Appellees argue that Appellants' First Amendment claims against Commissioner Harpstead are deficient because (1) they "did not allege that Commissioner Harpstead personally committed a constitutional violation," (2) "did not allege facts to plausibly support the elements of a First Amendment retaliation or compelled speech claim," and because (3) "Commissioner Harpstead is entitled to qualified immunity." Appellees' Br. 19.

Appellants have already set forth their arguments for their First Amendment claims against Commissioner Harpstead in their principal brief. *See* Appellants' Br. 38-49. On reply, Appellants respond to discrete aspects of the Appellees' arguments.

### A. Commissioner Harpstead Acted Personally and Purposefully to Violate the Norgrens' Constitutional Rights.

Appellees argue that Appellants fail to allege that Commissioner Harpstead personally acted with the "'purpose' of engaging in unconstitutional discrimination." *Ellis v. Houston*, 742 F.3d 307, 320 (8th Cir. 2014) (Loken, J., concurring, joined by Colloton, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)); *see* Appellees' Br. 19-22. More, they claim that Appellants' reliance on *Jackson v. Nixon*, 747 F.3d 537 (8th Cir. 2014), is misguided because that case dealt

1

with an Establishment Clause claim, and Establishment Clause claims only require knowledge, not purposeful intent. *See* Appellees' Br. 20-21.

Appellants agree—and have not disagreed—that the question of whether Commissioner Harpstead had "personal involvement" in the deprivations alleged is relevant to her liability for both retaliation and compelled speech. *See* Appellants' Br. 40-41. But referencing "personal involvement" merely begs the questions: what kind, and to what degree? The Commissioner's intent, or "purpose," is only relevant to retaliation, since compelled speech (like Establishment Clause claims) does not require a showing of intent on the part of government to compel speech. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019); *see also Cressman v. Thompson*, 798 F.3d 938, 948-49 (10th Cir. 2015) (the *existence* of speech on a license plate is enough to trigger First Amendment scrutiny). Further, Appellees never explain what facts would be required to adequately allege that a defendant had the "purpose" of discrimination. The Supreme Court has, though, and described the type of "purpose" section 1983 requires in retaliation claims in *Crawford-El v. Britton*, 523 U.S. 574 (1998).

Appellants detail Commissioner Harpstead's personal actions thoroughly in their principal brief. *See* Appellants' Br. 39-44. In short, Commissioner Harpstead implemented a policy whose ideological component and purpose to change "minds for life" evidenced its inherently discriminatory nature against Appellants, whose

2

own Christian beliefs were contrary to the content of the ideological training it advanced. This Court's *Jackson* case fully supports Appellants' argument for Commissioner Harpstead's "personal involvement." 747 F.3d at 543 ("Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in "creating, applying, or interpreting a policy" that gives rise to unconstitutional conditions.") (citing *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)). Appellants' pleadings give explicit notice to this theory of Commissioner Harpstead's personal involvement. *See, e.g.,* J.App.013-014, R. Doc. 1 at 13-14, Compl. ¶¶ 79-84 (Aaron) and J.App.088-090, R. Doc. 15 at 12-14, Am. Compl. ¶¶ 66-76 (Joseph).

As for Commissioner Harpstead's "intent" or "purpose" vis-à-vis retaliation, the Supreme Court has stated that

> When intent is an element of a constitutional violation, [] the primary focus is not on any possible animus directed at the plaintiff; rather, it is more specific, such as an intent to disadvantage all members of a class that includes the plaintiff . . . or to deter public comment on a specific issue of public importance.

*Crawford-El*, 523 U.S. at 592 (internal citation omitted). Appellants argue that Commissioner Harpstead exhibited this intent by the very promulgation of DHS policy at issue, which would "disadvantage all members of a class that includes the plaintiff," namely Christians, consistent with *Crawford-El*. The training mandate policy was, by its nature, discriminatory because it mandated trainings that sought

3

to correct the beliefs of those who expressed views on the subjects of race and gender contrary to the trainings' perspective. Appellants were a known part of that contrarian class.

Commissioner Harpstead's policy, by its call to change "minds for life," effected a conformist ethos. In practice, this encouraged the exclusion of those who did not subscribe to its ethos. Appellants made clear that their Christian beliefs prevented them from doing so. These allegations are sufficient to demonstrate Commissioner Harpstead's personal involvement, especially in light of *Jackson*.

## B. The Norgrens Have Sufficiently Pleaded First Amendment Retaliation.

Appellees argue that both Joseph's and Aaron's complaints are deficient in alleging facts to plausibly support their respective First Amendment retaliation claims. *See* Appellees' Br. 22-26. Appellants address these contentions as they relate to Joseph's and Aaron's pleadings, respectively, below.

### 1. Joseph Stated a Plausible Claim for First Amendment Retaliation.

Appellees argue that Joseph did not engage in constitutionally protected speech, the first element of a retaliation claim, by either "requesting an exemption from the gender identity awareness trainer" or "expressing his viewpoint on gender when answering a question from a night supervisor," because, Appellees say, neither constituted a "matter of public concern." Appellees' Br. 23.

4

Appellees argue that seeking a religious exemption from a mandatory training is not a protected activity because it does not involve a "matter of public concern." Appellees' Br. 23, 25. An objection to a government training on gender identity and the use of other employees' chosen pronouns is quite obviously speech on a matter of public concern, as the Sixth Circuit recently held:

> In short, the use of gender-specific titles and pronouns has produced a passionate political and social debate. All this points to one conclusion: Pronouns can and do convey a powerful message implicating a sensitive topic of public concern.

*Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021).

Further, Appellees miss the point that Joseph made his request for a religious exemption "on the basis of his sincerely held religious beliefs and race." J.App.088, R. Doc. 15 at 12, Am. Compl. ¶ 64 (Joseph). Thus, Joseph's exemption request was a constitutionally protected activity in that it was an exercise of his constitutional rights to both Free Exercise and Free Speech, and the exercise of a constitutional right is itself a protected activity. *See, e.g., Monteer v. ABL Mgmt.*, No. 4:21-CV-756 ACL, 2022 U.S. Dist. LEXIS 155987, at *22 (E.D. Mo. Aug. 30, 2022) (accepting as a protected activity an employee's request a religious accommodation). This principle is the analog to that found in Title VII retaliation cases. *See, e.g.*, *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1101 (8th Cir. 2018) ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always

5

constitutes the employee's opposition to the activity.") (quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 276 (2009)).

As for Joseph's statement on gender in 2018, this too is protected speech on a "matter of public concern." *See Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006). Appellees' claim that Joseph's statement was "not of concern to the community" but merely an expression of his "personal views" is disingenuous. A conversation whose topics are "*Roe v. Wade*, the U.S. Constitution, and gender identity," J.App.082, R. Doc. 15 at 6, Am. Compl. ¶ 27 (Joseph), obviously relates to "matter[s] of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146-47 (1983). Indeed, the reaction of Mr. Pherson, Joseph's night supervisor, to Joseph's comments and the very existence of DHS' gender training evidence the topics' concern to the community. *See* J.App.079-083, R. Doc. 15 at 3-7, Am. Compl. ¶¶ 13-16, 27-30 (Joseph). Whether or not the DHS "community," in particular, cared to hear his views on gender, Joseph's expression of them is protected employee speech.

Appellees also argue that Joseph failed to allege the second element of his First Amendment retaliation claim, that Commissioner Harpstead "personally took adverse action against [him] to chill his exercise of any First Amendment right to request exemption from gender identity training, or respond to his supervisor's question seeking his personal viewpoint on gender." Appellees' Br. 24.

However, Joseph did allege Commissioner Harpstead's personal involvement in the adverse, retaliatory action against him. *See* J.App.089-090, R. Doc. 15 at 13-14, Am. Compl. ¶¶ 68-76 (Joseph). As stated above, *see* Section I(A), Commissioner Harpstead's personal action arose from her promulgation of the training policy whose conformist ideology effectively excluded those who refused to have their minds changed "for life." *See Jackson*, 747 F.3d at 543.

Therefore, Joseph has sufficiently pleaded a plausible claim for First Amendment retaliation.

### 2. Aaron Stated a Plausible Claim for First Amendment Retaliation.

Appellees argue that Aaron fails to sufficiently plead his First Amendment retaliation claim for want of a protected activity and Commissioner Harpstead's personal involvement in his adverse action. *See* Appellees' Br. 25. Additionally, Appellees argue that Aaron "failed to plead facts plausibly demonstrating that he was qualified" for the promotion he was denied. Appellees' Br. 26.

Appellants explain above, with regard to Joseph, why an exemption request is a protected activity in these circumstances as well as the nature of Commissioner Harpstead's personal involvement in Appellants' adverse actions.

7

Regarding Aaron's qualifying for the Permanent Supervisor Position, the following chart displays both the "preferred" qualifications for the temporary position and the "Minimum Qualifications" for the permanent position:[1]

| Temporary Supervisor Position "Preferred" Qualifications | Permanent Supervisor Position "Minimum Qualifications" |
|---|---|
| <u>Minimum of one year supervisory experience</u> in a secure environment providing direct supervision of security or patient/client care programs to patients/clients committed as sexual psychopathic personalities, sexually dangerous persons, mentally ill and dangerous, or with developmental disabilities, who present a risk to public safety; OR | <u>A minimum of one year supervisory experience</u> in a secure environment providing direct supervision of security or patient/client care programs to patients/clients committed as sexual psychopathic personalities, sexually dangerous persons, mentally ill and dangerous, or with developmental disabilities, who present a risk to public safety; OR |
| <u>Minimum of one year</u> lead work or professional experience in a secure environment providing counseling, rehabilitative patient care, or direction of client care programs for patients committed as sexual psychopathic personalities, sexually dangerous persons, mentally ill and dangerous, or with developmental disabilities who present a risk to public safety; AND/OR | <u>A minimum of two years</u> leadwork or paraprofessional experience in a secure environment providing counseling, rehabilitative patient care, or direction of client care programs for patients committed as sexual psychopathic personalities, sexually dangerous persons, mentally ill and dangerous, or with developmental disabilities who present a risk to public safety; |

_____

[1] The text has been reformatted to show how the qualifications parallel each other. Emphasis has been added for clarity. J.App.025-026, R. Doc. 10-1 at 1-2, Ghreichi Decl. Ex. A, pp. 1-2 and J.App.027-028, R. Doc. 10-2 at 1-2, Ghreichi Decl. Ex. B, pp. 1-2.

| | |
|---|---|
| A Bachelor's Degree in Criminal Justice, Law Enforcement, Rehabilitation Therapy, Health Sciences, Behavioral Sciences or a related field may be substituted for 6 months of experience at this level OR <u>one year of supervisory experience</u> may be substituted for a maximum of 6 months of experience at this level.<br><br>(NOTE: Supervisory experience does not need to be within a secure environment); AND/OR | ** <u>A Bachelor's Degree in Criminal Justice</u>, Law Enforcement, Rehabilitation Therapy, Health Sciences, Behavioral Sciences or a related field may be substituted for 6 months of experience at this level OR <u>one year of supervisory experience</u> may be substituted for a maximum of 6 months of experience at this level.<br><br>(NOTE: Supervisory experience does not need to be within a secure environment); OR |
| An equivalent combination of the above. | An equivalent combination of the above. |

Unless Supervisor Wondra was relying on the "equivalent combination of the above" category, Aaron would not have qualified for *either* the temporary or permanent position. Thus, Supervisor Wondra's acknowledgment of his eligibility for the temporary position and encouragement to apply for the permanent position with the *same* qualifications conclusively show that Aaron's bachelor's degree in criminal justice and 9 years of supervisory experience in the military qualified him, as an "equivalent combination," for the Permanent position. J.App.009, R. Doc. 1 at 9, Compl. ¶¶ 43-47 (Aaron). That is, at least, before he filed his EEOC charge. Contrary to Appellees, Aaron adequately alleged that he met the requirements for the position.

Appellees' argument that Aaron was not qualified for the Permanent Supervisor Position derives from a misreading of the qualifications. As they argue in their Factual Background, Section I(C), "[t]he Permanent Supervisor posting credited Aaron with up to six months experience for either his bachelor's degree, or his military supervisory experience, but not both." Appellees' Br. 13. But this interpretation conflicts with the broad and unqualified language of "[a]n equivalent combination of the above."

Moreover, Appellees do not explain how Aaron could have been qualified for the Temporary Supervisor Position if their reading of the Permanent position's qualifications is correct. The disjunctive is present in the Temporary position's substitution paragraph just as it is in the Permanent position. If Aaron qualified for the Temporary position based on his substituted qualifications, he was necessarily qualified on the same basis for the Permanent position.

Because Aaron qualified for the Temporary Supervisor Position, as evidenced by his receiving an invitation to interview, he was also qualified to receive an interview for the Permanent position. DHS' sudden reversal, denying him that opportunity, right on the heels of his EEOC charge, are sufficient at the Rule 12 stage to send this case into discovery. Aaron has sufficiently pleaded a plausible claim for First Amendment retaliation.

Appellate Case: 23-1207     Page: 14     Date Filed: 05/19/2023 Entry ID: 5278946

## C.    The Norgrens Stated Plausible First Amendment Compelled Speech Claims.

Appellees argue that the Appellants' compelled speech claims fail for want of government compulsion as well as for want of Commissioner Harpstead's personal involvement in any compulsion. *See* Appellees' Br. 26-28.

First, Appellees argue that Appellants did not allege that "Commissioner Harpstead personally required them . . . to affirmatively make, or refrain from making, any statements in front of a supervisor or to submit an affidavit to that effect." Appellees' Br. 27. Appellees' contention that government compulsion only involves speech given in front of a supervisor or by affidavit is without basis, and Appellees cite to no precedent for this requirement.

Second, Appellees claim that "[t]here was no speech here." Appellees' Br. at 27. This bald claim contradicts, without elaboration, the allegations Appellants have made concerning the trainings' content and corresponding directives to employees, including Aaron and Joseph. *See* J.App.003-004, R. Doc. 1 at 3-4, Compl. ¶¶ 14-18 (Aaron) and J.App.079-080, R. Doc. 15 at 3-4, Am. Compl. ¶¶ 13-17 (Joseph); *see also* Appellants' Br. 45-46.

Third, Appellees claim that "[a]ny perceived threats of discipline or termination" for not watching the training videos or following their rules for speech "are pure speculation." Appellees' Br. 27. Yet the Appellees admit that the Appellants were "expected"—indeed, "required"—to watch the training videos. Appellees' Br. 27. If

11

an employer *requires* something of an employee, it is not "pure speculation" to assume that the requirement carries with it the implicit *or else* of a repercussion should the employee fail to fulfill it. *See, e.g., Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 (8th Cir. 2001) ("An employee who refuses to be trained has, from the employer's reasonable perspective, impeded his or her ability to do the job."); *see also* "Require," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/require (last accessed May 18, 2023) (2b: "to demand as necessary or essential"; 3: "to impose a compulsion or command on: COMPEL").

Fourth, despite claiming that Aaron's complaint is a "carbon copy" of Joseph's, Appellees argue that Joseph's complaint is the only one that even alleges compelled speech and only tenuously connects the action with Commissioner Harpstead. *See* Appellees' Br. 27-28. Again, Appellees overlook Commissioner Harpstead's role as the originator of the policy that implemented the trainings, which Appellants have addressed above. As for Aaron's complaint, his Count IV cause of action lists compelled speech, and, while all the elements are not rehearsed in that section, the incorporated previous paragraphs include each element. *See* J.App.003-007, R. Doc. 1 at 3-7, Compl. ¶¶ 13-34 (Aaron).

Therefore, both Joseph and Aaron have pleaded sufficient facts to support their claims that Commissioner Harpstead sought to compel their speech in violation of the First Amendment.

12

### D. Commissioner Harpstead Is Not Entitled to Qualified Immunity.

Appellees argue that Commissioner Harpstead is entitled to qualified immunity because Appellants have "failed to plead facts to support First Amendment retaliation and compelled speech claims" and because the right at issue had not been clearly established to make "an individual defendant liable for First Amendment retaliation or compelled speech for requiring all employees to attend diversity training even where they [i.e., the defendant] had no personal involvement with the underlying 'particularized' facts." Appellees' Br. 29.

Appellants have addressed the first contention above and the second in their principal brief. *See* Appellants' Br. 47-49. Regarding the second, however, the need for "similar circumstances" is satisfied by Commissioner Harpstead's direction and communication urging a "focus on training" to change "minds for life." J.App.007, R. Doc. 1 at 7, Compl. ¶ 33 (Aaron) and J.App.083, R. Doc. 15 at 7, Am. Compl. ¶ 30 (Joseph). This clearly demonstrates that she had the knowledge and purpose to compel the thoughts and speech of employees by means of the trainings.

It is clearly established that compelling employees' speech contrary to their beliefs on matters of public concern violates the First Amendment. As the Supreme Court has stated, "Some of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. FAIR*, 547 U.S. 47, 61 (2006).

13

Appellees attempt to evade this clearly established general principle by making hair-splitting distinctions. *See* Appellees' Br. 31. But as the Supreme Court has stated:

> "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful[.]'" [citations omitted] . . . Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts.

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997). Thus, when a government official expressly offends this general principle—"that freedom of speech prohibits the government from telling people what they must say"—with a purpose to compel speech targeted at Christians, which purpose then is implemented in action, a court need not search for any more specific precedent in order to find that she has violated clearly established precedent.

Therefore, Commissioner Harpstead may not invoke qualified immunity because her actions in implementing the offending policy violated clearly established precedent.

## II.  <u>Aaron Stated a Plausible Title VII Retaliation Claim</u>

Appellees argue that Aaron's Title VII retaliation claim fails to establish but-for causation; specifically, (1) because the timing of his adverse action was mere

coincidence, and he was simply not qualified for the Permanent Supervisor Position;
(2) because he "fails to plead facts suggesting that decisionmakers knew of his
protected activity when rejecting his application" for the Permanent position; and
(3) because he "fails to plead facts showing that DHS ever filled the Permanent
Supervisor Position or that it was filled by anyone outside his protected class who
was similarly or less qualified." Appellees' Br. 33.

Appellants explain above how Aaron indeed qualified for the Permanent position.
So the timing of his rejection for that position cannot be dismissed as mere
coincidence. The short interval of three weeks between Aaron's protected activity
and his rejection for the promotion raises an inference of retaliatory motive and thus
an issue of material fact, as Appellants argue at length in their opening brief. *See*
Appellants' Br. 22-24; *see also O'Bryan v. KTIV Television*, 64 F.3d 1188, 1193-94
(8th Cir. 1995) (noting "close proximity in time between plaintiff's administrative
filings and his termination established, at minimum, a genuine issue of material fact
on the elements of his prima facie case") (internal quotation marks and citation
omitted). This short temporal proximity *alone* is sufficient to establish but-for
causation in the *prima facie* test under Title VII at the Rule 12 stage. *See, e.g.,*
Appellants' Br. 23 n.78 (collecting cases).

Therefore, Aaron has plausibly pleaded all three *prima facie* elements of Title
VII retaliation: a protected activity, a materially adverse action, and a but-for causal

15

inference based upon his qualifying for the position and the suspicious timing of his rejection to interview for it. Following this Court's precedent for motions to dismiss under the *McDonnell Douglas* standard, the Court should reverse based on Aaron adequately pleading his *prima facie* case. *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

After discovery and on *summary judgment*, once Aaron adduces facts fleshing out these allegations, the burden will shift to the Appellees "to articulate a legitimate, nondiscriminatory reason for [their] actions." *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).

Appellees' citation to *McPherson v. Brennan* is particularly unhelpful to their argument. In that case, this Court reversed the dismissal of an ADEA claim where the plaintiff alleged that the USPS did not use the stated criteria for a position in its evaluations:

> McPherson's allegations indicated that the criteria the USPS relied upon in evaluating qualification for the position differed from the criteria set forth in the job description, as the individual selected for the position did not meet the stated criteria.

*McPherson v. Brennan*, 888 F.3d 1002, 1003 (8th Cir. 2018). *McPherson* is a weaker case than Aaron's. As noted above, Aaron alleged that he *was* qualified based on the discretionary "equivalent combination" of the job description. But even if the Court were to interpret the "equivalent combination" language differently, Aaron was no

16

more qualified for the temporary position than he was for the permanent one. So in that case, he would fall directly under *McPherson*, because he was initially told he was qualified and invited to apply.

Trying to bootstrap the summary judgment analysis into the *prima facie* case, Appellees simply reassert that Aaron did not meet the requirements of the Permanent position and that he should know more than he does about who filled it. *See* Appellees' Br. 11-13, 34-37. Appellees claim that "[i]n the context of this case, on these specific allegations, Aaron should be expected to present more factual allegations than he did." Appellees' Br. at 37, n.99. By this, they really mean that they want Aaron to prove his case at this early stage under a Rule 56 standard.

Incredibly, Appellees suggest that Aaron should have filed a data request with DHS under the Minnesota Government Data Practices Act ("DPA") to obtain more evidence about DHS' hiring decisions. *Id.* Appellees know better. The DPA does not provide a specific time frame for a response to a request, but instead requires government entities to respond in an "appropriate and prompt manner." Minn. Stat. § 13.03, subd. 2(a). On the other hand, Title VII imposes strict timing requirements on aggrieved plaintiffs. One need not be an expert on the Minnesota DPA to recognize that state governments might have a more leisurely response to a DPA request than Title VII would accommodate. Regardless of Aaron's ability to

17

supposedly collect such facts, a plaintiff cannot be expected to plead facts normally revealed only after discovery.

Finally, Appellees argue that Aaron has not pleaded that any decisionmakers knew of his protected activity such that they could be said to have retaliated against him in response. *See* Appellees' Br. 38. This is both irrelevant and factually inaccurate at this stage. First, as noted above, the proximity of the Charge to the denial of the opportunity to apply for the Permanent Position itself creates an inference of causation that satisfies the *prima facie* pleading requirements. Second, under Title VII, on *summary judgment*, "[a] plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation." *Buettner v. E. Arch Coal Sales Co*., 216 F.3d 707, 715 (8th Cir. 2000)*.* This is not a pleading requirement under Rule 8 or in the Rule 12 analysis.

But Aaron did plead that Patrick Patterson, from the Human Resources Office, told him "that he did not meet the minimum qualifications of the job posting and was thus ineligible for the position or even an interview." J.App.009, R. Doc. 1 at 9, Compl. ¶ 42 (Aaron). Aaron also alleged that, prior to this denial of interview, this same Patrick Patterson remained adamant that Aaron should not receive the day off he requested after Aaron had "vocalized his disagreement with the trainings, and voiced his opposition to CRT and the Gender Ideology Training." J.App.007-008,

R. Doc. 1 at 7-8, Compl. ¶¶ 35-36 (Aaron). These pleadings raise the inference that Patrick Patterson and DHS had actual or constructive knowledge of Aaron's objections to the trainings. More than that, as a DHS employee working in the Human Resources Office, it is reasonable to infer that Patrick Patterson would have had knowledge of Aaron's EEOC charge, which is protected activity.

Therefore, Aaron pleaded sufficient facts to support his Title VII retaliation claim.

## III. **Joseph Stated a Plausible Claim for Religious Discrimination.**

Appellees argue that Joseph's Title VII discrimination claim fails to establish both that he was constructively discharged and any inference of religious discrimination. *See* Appellees' Br. 41-46. Appellants address both issues at length in their principal brief. *See* Appellants' Br. 29-38.

Appellees argue that Joseph's claim of constructive discharge rests on "three discrete incidents," Appellees' Br. 41, but their treatment of these incidents as discrete fails to address "all the circumstances." *Harris v. Forklift Sys*., 510 U.S. 17, 23 (1993); *see also Warmington v. Bd. of Regents of the Univ. of Minn*., 998 F.3d 789, 795 (8th Cir. 2021) ("The complaint 'should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.'") (quoting *Wilson*, 850 F.3d at 371).

Specifically, Joseph pleaded that after the 2018 conversation with his supervisor he noticed a marked shift in how he and his son were treated as employees. J.App.082-083, R. Doc. 15 at 6-7, Am. Compl. ¶¶ 27-29 (Joseph). The simmering hostility that began then came to a boil when Commissioner Harpstead implemented her trainings policy that targeted Joseph's Christian beliefs and speech. *See* J.App.083-084, R. Doc. 15 at 7-8, Am. Compl. ¶¶ 30-33 (Joseph). Altogether, this amounted to religious hostility "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotations and citation omitted).

Appellees also target the timeline of Joseph's resignation, suggesting that because Joseph made his retirement announcement (October 6, 2020) "three weeks before DHS denied his exemption request (October 27, 2020) and before he made his first-ever report of harassment to DHS (October 30, 2020)" this means his retirement was voluntary and not a constructive discharge, and there was no reasonable opportunity to correct the environment. Appellees' Br. 43. But the Appellees' timeline is truncated to avoid the simmering hostility Joseph faced since 2018 and the imposition of the offensive trainings in August 2020.

It is true that the DHS's denial of Joseph's exemption request from the trainings "'confirmed' his decision to retire." Appellees' Br. 43. Joseph saw the handwriting on the wall when the required trainings were announced in August 2020, and he saw

Appellate Case: 23-1207     Page: 24     Date Filed: 05/19/2023 Entry ID: 5278946

what it spelled when nothing came of his voicing his objection to the gender identity training to Supervisor Ploog in September 2020, J.App.081, R. Doc. 15 at 5, Am. Compl. ¶ 20 (Joseph). In short, the company to which he had given 27 years was taking a new ideological direction, one that sought either to convert or else exclude traditionally-minded Christians like Joseph. His conversation with Supervisor Ploog was the "reasonable opportunity" Appellees overlook; but nothing came of it, hence Joseph's retirement announcement the following month.

Appellees point to Aaron's continued employment with DHS as proof that Joseph's working conditions were not so intolerable that he "was forced to quit." Appellees' Br. 44. Again, Appellees knead the applicable standard. As the Supreme Court stated, "[a] plaintiff who advances [a hostile-environment constructive discharge claim] must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). This does not mean that every person in the plaintiff's position must be shown to have in fact resigned. Rather, a plaintiff need only show that resigning "qualified as a fitting response" to the hostile working environment. *Id*. at 134. Appellants detail the hostility of Joseph's working environment in their principal brief, which shows how the environment was so hostile to Joseph's traditionally-minded Christian beliefs that resigning was a fitting response. *See* Appellants' Br. 9-10.

Appellees also bring up the permissibility of diversity trainings in general to argue that "mandating that all employees attend diversity training does not plausibly show that DHS intended to force Joseph to quit." Appellees' Br. 44. But the trainings in question were implemented with the express intent of forcing changes to employees' "minds for life" and their content evidenced such an intent. J.App.079-080, R. Doc. 15 at 3-4, Am. Compl. ¶¶ 13-16 (Joseph). "Gender identity" training that requires employees to use the selected pronouns of other employees are not traditional "diversity trainings" that teach respect for others and compliance with the law. Rather, they seek to achieve conformity in contrast to known religious beliefs, not tolerance or acceptance. And Appellees denied Joseph the exemption he requested. Appellees simply fail to account for the circumstances of the trainings and their content, which were inherently discriminatory.

Appellees' citation of *Altman* is unhelpful to their premise that mandatory trainings are no problem. Appellees' Br. 45. To be sure, employee trainings are commonplace, but where a training drags matters of public concern from outside of work into the employment setting, the government employer "create[s] a context in which employees speaking out in opposition to their public employer's handling of this social issue should be considered speech on a matter of public interest and concern." *Altman*, 251 F.3d at 1202. In *Altman*, this Court actually reversed a summary judgment decision in favor of the government employer because the

22

employer reprimanded the employees, and there remained fact issues as to why. *Id.* at 1203.

Finally, Appellees argue that Joseph failed to plead facts that raise a plausible inference of discrimination. *See* Appellees' Br. 46. Appellants address this issue at length in their principal brief. *See* Appellants' Br. 34-38. Contrary to Appellees' assertion that Joseph pleads only "factually-deficient legal conclusions" to support this element, Joseph identifies his treatment by his supervisor in 2018 and the ensuing hostility he faced as well as the imposition of the gender training itself as evidence of religious discrimination. J.App.082-083, 087, R. Doc. 15 at 6-7, 11, Am. Compl. ¶¶ 27-28, 33, 56 (Joseph). DHS's requirement of the inherently anti-Christian gender training as well as its refusal to accommodate Joseph's beliefs demonstrates that the DHS did not treat him the same as those with the same work history and position who did not have a religious objection to the content of the training.

Therefore, Joseph pleaded sufficient facts to support his claim for religious discrimination under Title VII.

## IV. Aaron Pleaded Sufficient Facts to State a Plausible Claim for Religious Discrimination.

Appellees argue that Aaron's claim fails either because he pleaded discrimination on retaliatory grounds and not on the basis of his Christian status, or, assuming he properly pleaded his Christian status, his claim nonetheless fails because he was not

qualified for the position he sought and he failed to allege that similarly situated employees were treated more favorably. *See* Appellees' Br. 46-49. Appellants have already addressed above how Aaron qualified for the Permanent position. Appellants also address Aaron's pleading of similarly situated employees above and in their principal brief. *See* Appellants' Br. 26-29.

Regarding the sufficiency of Aaron's pleading discrimination on the basis of his Christian status, Aaron alleges in his complaint that the gender training which he opposed required him to assent to beliefs antithetical to his Christian faith. *See* J.App.004, 006, R. Doc. 1 at 4, 6, Compl. ¶¶ 17, 23 (Aaron). As his complaint makes clear, Aaron opposed the training "as a Christian." J.App.011, R. Doc. 1 at 11, Compl. ¶ 64 (Aaron). In other words, his opposition derived from his status as a Christian; his expression of opposition through his protected activity—his filing a charge of discrimination with the EEOC—is based on his status as a Christian: the charge was *religious* discrimination. Aaron therefore sufficiently pleaded that his Christian status was a "motivating factor" in his employer's discriminatory action denying him the promotion. *See Leighton v. Madison Cent. Sch. Dist. #39-2*, No. 4:16-CV-04079-RAL, 2018 U.S. Dist. LEXIS 167924, at *19 (D.S.D. Sep. 28, 2018) ("The difference between a discrimination claim and a retaliation claim under Title VII is important; while a plaintiff alleging discrimination can succeed by showing that a protected characteristic was a 'motivating factor' for the employer's decision,

Appellate Case: 23-1207     Page: 28     Date Filed: 05/19/2023 Entry ID: 5278946

a plaintiff alleging retaliation has the higher burden of showing that unlawful retaliation was the 'but-for cause' of the adverse action.") (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349, 352 (2013)).

Therefore, Aaron pleaded facts sufficient to support his claim for religious discrimination under Title VII.

## CONCLUSION

For the reasons set forth in this brief and in Appellants' other submissions and arguments, Appellants respectfully request that the Court reverse the District Court's decision.

**UPPER MIDWEST LAW CENTER**

Dated: May 18, 2023

   */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

25

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,709 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2304 in Times New Roman font, 14-point.

3. The brief has been scanned for viruses and is virus free.

**UPPER MIDWEST LAW CENTER**

Dated:  May 18, 2023

    */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

26

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service has been accomplished by the CM/ECF system.

**UPPER MIDWEST LAW CENTER**

Dated: May 18, 2023

*/s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

27